McATEE v. SHADE.

(Circuit Court of Appeals, Eighth Circuit.   December 6, 1910.)

No. 3,133.

**1. BILLS AND NOTES (§ 226*)—INDORSEMENT—CONSIDERATION.**

The banking law of Missouri (Rev. St. 1899, § 1281 et seq.) provides that the business of state banks shall be managed by a board of not less than three directors; that no such bank shall lend to any one borrower a sum exceeding 25 per cent. of the amount of its paid capital and surplus; that the cashier shall give bond conditioned that he will hold the bank harmless from any loss occasioned by any of his acts as such officer; and that he shall be subject to removal by the directors.   It also provides that, if unlawful uses of the funds of a bank have been made, the Secretary of State shall require that such amounts be restored to it by the person or persons responsible for such wrongful use.   Held, that where a bank had lent to a borrower sums far in excess of the legal limit, for which it held notes, the indorsement of such notes by the cashier, who was also a director and who made the examinations, made at the insistence of the bank examiner, which under the law of the state made him a guarantor and required a new consideration, was based on a sufficient consideration.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 534–541; Dec. Dig. § 226.*]

**2. BANKRUPTCY (§§ 165, 181*)—VOIDABLE "PREFERENCE"—MORTGAGE SECURING ANTECEDENT DEBT—"PRESENT CONSIDERATION."**

A Missouri state bank lent to a corporation, the president of which was also president and a director of the bank, sums in excess of the limit allowed by the law of the state, and held the corporation's notes therefor.   The bank examiner required the indebtedness to be reduced, whereupon it was divided and notes of other parties connected with the officers, some of whom were irresponsible, were substituted for a portion of it; all being secured by a mortgage on the corporation's property which was not recorded.   Later, on the insistence of the bank examiner, others, including the cashier of the bank, indorsed such notes.   The cashier, who made the examinations, afterward assumed all of the notes, taking a note and mortgage from the corporation to himself therefor, and surrendering the bank's mortgage.   The corporation was insolvent when both mortgages were given, as all parties had reasonable cause to believe, and became a bankrupt within four months after making the mortgage to the cashier.   Held that, notwithstanding the substitution of the individual notes for those of the corporation, it remained the real debtor, and by indorsing such notes the cashier became its creditor; that the mortgage to him, which was not recorded until suits against the corporation were threatened, was not given or accepted in good faith and for a present consideration, within Bankruptcy Act July 1, 1898, c. 541, § 67d, 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), but as a fraud upon such act, and was void under subdivision "e" of said section, and also as a preference under section 60b, as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1909, p. 1314).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. §§ 165, 181.*

For other definitions, see Words and Phrases, vol. 6, pp. 5498, 5499; vol. 8, pp. 7759, 7761.]

Appeal from the District Court of the United States for the Southeastern Division of the District of Missouri.

In the matter of the Jackson Brick & Tile Company, bankrupt; William P. Shade, trustee.   Appeal by Samuel McAtee, executor of

the estate of Hugh R. Quinn, deceased, from an order disallowing a lien. Affirmed.

Wilson Cramer, for appellant.

A. P. Stewart, T. D. Hines, and Moses Whybark, for appellee.

Before SANBORN and ADAMS, Circuit Judges, and REED, District Judge.

REED, District Judge. The Jackson Brick & Tile Company, a Missouri corporation, was duly adjudged bankrupt upon petition of certain of its creditors filed October 8, 1906, and the defendant in error in due time appointed trustee of its estate. June 28, 1906, the Brick & Tile Company (which will be called the "bankrupt") made to Hugh R. Quinn its note for $28,200 and a trust deed of all of its property to secure the same. August 8th following, this deed of trust (which will be called the "mortgage") was filed for record in the proper office at 6:10 p. m., and duly recorded. Quinn in due time filed with the referee proof of such note and mortgage, and asked that the balance due upon the note, viz., $27,600, be allowed as a claim secured by such mortgage and entitled to priority of payment from the proceeds of the property included therein. The trustee objected to the allowance of the claim as secured, upon the grounds: (1) That the mortgage was in fact a voidable preference; (2) that it was made by the bankrupt with intent to hinder, delay, and defraud its creditors, was accepted by Quinn with like intent, and not in good faith, and is therefore void. The referee overruled the objections and held that the mortgage was neither intended as a preference nor to defraud the creditors of the bankrupt, and allowed the claim as one entitled to priority of payment from the proceeds of the property included in the mortgage. Upon petition by the trustee for review of this order, the District Court held that the mortgage was not a preference, but was made by the bankrupt with intent to defraud its creditors and accepted by Quinn with like intent, reversed the order of the referee, and directed that the claim be disallowed unless Quinn should relinquish all claim to the property covered by the mortgage. From such order Quinn brought this appeal, and, having died during its pendency, it has been revived in favor of the appellant as his executor.

The principal facts disclosed by the testimony are: That the bankrupt was incorporated in 1897 under the name of the English Mining & Manufacturing Company, and its name afterwards changed to that of the Jackson Brick & Tile Company. Its principal place of business was at Jackson, Cape Girardeau county, Mo., where it was engaged in the manufacture of brick and tile. Henry R. English was its principal stockholder and has been its president and the general manager of its affairs from its organization to the time of its bankruptcy. The Jackson Exchange Bank of Jackson (which will be called the "Jackson Bank") was organized by Henry R. English, Hugh R. Quinn, the deceased, and some others as a banking corporation under the laws of Missouri in 1893, with a capital of $20.000, and prior to 1905 had accumulated a surplus of $10,000. English and Quinn were among its first directors. Quinn was its first cashier, and

by June, 1906, or prior thereto, had acquired a controlling interest in the bank. English became its president in 1897, and continued to act as such until July, 1906, when he was succeeded by John A. Snider, who became vice president in the early part of 1905. The bankrupt early became a borrower from the Jackson Bank, and in 1902 its indebtedness to the bank was some $10,000, which in May, 1905, had increased to $25,783.32. Quinn and English were also two of the executive committee of the bank, charged with the duty of approving or rejecting all applications for loans, and Mr. Quinn testified that he approved all of the loans made to the bankrupt and permitted the creation of its indebtedness to the bank. Early in 1905 the State Bank Examiner objected to these loans, and severely criticised Mr. Quinn and others of the bank's officers for permitting the bankrupt to become indebted to it in excess of the legal limit (which was 25 per cent. of its capital and surplus), and insisted upon the indebtedness being reduced and secured. Because of this the indebtedness was put into four notes on May 12, 1905, three of which were for $7,500 each and one for $3,283.32. Each note was payable to the bank or order, contained a recital that it was "for value received," and a clause:

"That the makers and indorsers severally waive presentment for payment, notice of nonpayment and protest, and consent that the time of payment may be extended without notice thereof."

One of the $7,500 notes was payable at the bank in nine months and signed by the bankrupt corporation by Henry R. English as its president; one in seven months, signed by Henry R. English individually; one in six months, signed by Catherine Oates; and the $3,283.32 note in 90 days and signed by U. M. English. Catherine Oates is an elderly lady who has resided in the family of Mr. English for many years, and U. M. English is a daughter of Mr. English, and each was without financial responsibility. As security for these notes the bankrupt and Mr. English made to the bank two trust deeds which included all of the property of the bankrupt, but they were withheld from record because, as Mr. Quinn says:

"We did not want the public to know we had made so large a loan to English; therefore they were kept secret and not placed of record, and only the directors of the bank knew of them."

In the latter part of August, 1905, the bank examiner again insisted that this indebtedness be paid, or reduced and additional security obtained for it. Thereupon Quinn and English agreed with the bank examiner to indorse the notes, and English also agreed to have his wife indorse them. Pursuant to this agreement, Quinn and Mrs. English on August 25, 1905, indorsed each of the four notes, and H. R. English also indorsed the three that were not signed by him. Prior to this time John A. Snider, who had lately become vice president of the bank, also began to urge that the indebtedness be paid, and others of the directors joined him in so doing. The bankrupt in 1905 was owing the Sturdivant Bank of Cape Girardeau, Mo. (which will be called the "Sturdivant Bank"), $15,000 and accrued interest; the Merchants-Laclede National Bank of St. Louis (which will be called the "Laclede Bank"), $8,500 and interest; the Whitewater Bank of White-

water, Mo., $2,500 and interest; and various amounts to others. Its entire indebtedness including that to the Jackson Bank was about $70,-000, and its assets at the time of the bankruptcy were scheduled at $45,190 and appraised in March, 1907, at $24,661. Quinn knew of the indebtedness to these banks, and also of some at least of the other indebtedness. The Sturdivant Bank held as security an unrecorded trust deed upon 114 acres of land, the property of the bankrupt, and the Laclede Bank held an unrecorded trust deed covering its plant. This property was included in the trust deeds to the Jackson Bank. The Whitewater Bank and the other creditors were unsecured, and some at least were pressing their claims for payment, and the Whitewater Bank had threatened suit. Mr. English was negotiating with some bank in St. Louis for a loan sufficient to take up the entire indebtedness of the bankrupt. In this condition of its affairs, Mr. Quinn in June, 1906, agreed with Mr. English that, if the bankrupt would give to him the same security the Jackson Bank held, he would arrange to pay its indebtedness to that bank and take the mortgage property as security. English assented to this, and on June 28th the note and mortgage of $28,200 were made by the bankrupt to Quinn. Quinn then negotiated for and obtained through the president of the Sturdivant Bank a loan of $20,000 and borrowed from the Jackson Bank $7,000. With this money and some $600 besides, he on July 6, 1906, paid the indebtedness of the bankrupt to the Jackson Bank, which with interest amounted to some $27,600, took up the four notes of May 12, 1905, and the unrecorded trust deeds held by the bank as security, and returned them to Mr. English. When the note and mortgage of June 28th were made, it was agreed between Quinn and English that the mortgage should not be placed of record for the reason that:

"The interests of English were so interwoven with the bank that placing it on record would shatter the confidence of the community in the bank."

Mr. Quinn says:

"That is the reason why I consented not to place it on record, and another reason was, to give English an opportunity to consummate a deal in St. Louis."

Subsequent to the making of this mortgage, the Sturdivant Bank had requested of Mr. English an explanation of his dealings with that bank; and about August 8, 1906, it had turned over to its attorney for collection its claim against the bankrupt. On August 8th the president of the Sturdivant Bank, and its attorney, had a conference with Mr. Quinn and his attorney at the Sturdivant Bank office in Cape Girardeau. At the close of or during this conference Quinn's attorney advised him to place his mortgage of record, and at 6:10 p. m. of that day Mr. Quinn filed the same for record. A few minutes later English filed for record the trust deed to the Sturdivant Bank and the one to the Laclede Bank, and one or two other instruments affecting the title to this property, which were all dated prior to the Quinn mortgage of June 28th. How Mr. English came to be in possession of these instruments does not appear. The result of the placing of these instruments of record at that time was that these trust

deeds which antedated the mortgage to Quinn were placed of record after that mortgage was. The next day, August 9th, the Sturdivant Bank sued out an attachment against the bankrupt and attached all of its property, except that included in the trust deed to it; and the bankruptcy proceedings followed on October 8th. When negotiating for the loan of $20,000, Mr. Quinn said to the president of the Sturdivant Bank that he wanted the money to pay a debt of the bankrupt to the Jackson Bank of some $27,000 which he felt morally bound to pay, and that English was involved to such an extent that he did not expect to be reimbursed for whatever he paid. Mr. Quinn says:

"The reason why the Jackson Bank was anxious to settle the claim against the bankrupt was that the loan was too large for the capital of the bank, and that the bank examiner had criticised us severely on account of the loan."

English and Quinn had been long time friends and business associates. English was circuit clerk and recorder of Cape Girardeau county for some 14 years, and Mr. Quinn was his deputy during that time. They retired from this office in 1893, shortly after organized the Jackson Bank, and afterwards as directors and officers of the bank jointly managed the same until July, 1906, when English was succeeded as president by John A. Snider, but Quinn continued as cashier.

The questions for determination upon the facts above stated are: (1) Was the mortgage to Quinn of June 28th a preference under section 60b of the bankruptcy act? Act July 1, 1898, c. 541, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445). If not, (2) was it made by the bankrupt and accepted by Quinn in good faith upon a present consideration and valid under section 67d? Or (3) was it made with intent to hinder, delay and defraud the creditors of the bankrupt, and void under section 67e of the act? That the bankrupt corporation was insolvent on June 28, 1906, when the mortgage to Quinn was made, and had been for more than a year prior thereto admits of no doubt under the testimony, and that question need not be further considered. That Mr. Quinn had actual notice of such insolvency, or at least of such facts as would put a reasonably prudent person upon inquiry which if pursued would have disclosed to him the bankrupt's insolvency, is equally clear. His business and social relations with English were so close and had continued for such length of time that he must have known, and the evidence leaves no room to doubt that he did know, of the bankrupt's hopeless insolvency. To answer the first of the above questions requires that it be first determined whether or not Mr. Quinn at the time his mortgage was made was a creditor of the bankrupt. The appellant contends that he was not. On August 25, 1905, Mr. Quinn indorsed the four notes of May 12th in favor of the bank, one of which was signed by the bankrupt, one by English, one by his daughter, and the other by another member of his family, all of which were for an existing indebtedness of the bankrupt to the Jackson Bank, one of which was then past due. The fact that three of these notes were not signed by the bankrupt is wholly immaterial. They were all for its then existing indebtedness to the bank which was put in the form of these notes at the instance of the bank examiner to make it appear upon the books of the bank that the indebted-

ness was not in excess of the legal limit. But putting the indebtedness in this form did not extinguish it nor relieve the bankrupt from its payment, nor Quinn and English from their liability to the bank for permitting the bankrupt to incur it in violation of law. Mr. Quinn having thus indorsed these notes at once became liable to the bank either as maker or guarantor for their payment, if there was a valid consideration for his indorsement of them, and at the same time became a creditor of the bankrupt. Swarts v. Siegel, 117 Fed. 13–17, 54 C. C. A. 399; Kobusch v. Hand, 156 Fed. 660, 84 C. C. A. 372; In re Lyon, 121 Fed. 723, 58 C. C. A. 143.

But it is urged that Mr. Quinn's indorsement was after the notes had been executed and delivered to the bank, was without any new consideration, and that in so indorsing them he incurred no liability upon either of the notes. We cannot assent to this. Under the law of Missouri one not a party to commercial paper who signs his name on the back thereof at the time it is first put into circulation is deemed to be a joint maker thereof and is liable as such; but if he so indorses it afterwards he is deemed a guarantor, and a new consideration is necessary to support the indorsement. Stagg v. Linnenfelser, 59 Mo. 336; Burnham v. Gosnell, 47 Mo. App. 637; Adams v. Huggins, 73 Mo. App. 140. In either event the note and the indorsement thereon, being in writing, are presumed to be upon a valid consideration, and in a suit thereon it is unnecessary to set forth the considerations. Rev. Stats. Mo. 1899, § 894; Caples v. Branham, 20 Mo. 244, 64 Am. Dec. 183; Lindell v. Rokes, 60 Mo. 249, 21 Am. Rep. 395; Glasscock v. Glasscock, 66 Mo. 627; Montgomery County v. Auchley, 92 Mo. 126, 4 S. W. 425. And see Mandeville v. Welsh, 5 Wheat. 277–283, 5 L. Ed. 87; Page v. Bank, 7 Wheat. 35–37, 5 L. Ed. 390; Parsons, Notes & Bills, p. 175.

Though the evidence shows that Quinn's indorsement of the notes in question was after they had been first delivered to the bank, there is neither allegation nor proof that such indorsement was without consideration. Quinn studiously avoided saying there was no consideration for his indorsement, and all he said is that "he was not a creditor of the bankrupt when it made to him the note and mortgage of June 28th." But this is a mere conclusion only. He says that when he signed the notes on August 25th that:

"The bank examiner was there and insisted on the paper being taken care of in the bank, and asked me to indorse the notes, and I did so."

And Snider, vice president of the bank, was also urging that they be taken care of. After so indorsing them, the notes were redelivered to the bank, and they were entered upon its books as against the indorsers as well as against the makers. Quinn has never denied or repudiated that indorsement; on the contrary, he has at all times recognized it as a valid obligation on his part for the payment of the notes, and he alleges in his reply to the objection of the trustee to the allowance of his claim as a secured claim:

"That this claimant had asumed the payment of the entire indebtedness of said company (the bankrupt) to said bank, and agreed to advance and loan to said company the necessary amount of money for that purpose."

We think that the evidence not only wholly fails to show that there was no consideration for Quinn's indorsement of these notes, but, on the contrary, that it affirmatively shows there was ample consideration therefor. The Revised Statutes of Missouri (1899) provide in substance that the affairs and business of banks organized under the laws of that state shall be managed by a board of directors of not less than three, who shall be elected annually from the shareholders (section 1281); that no such bank shall loan its money to any one individual, company, or corporation, or permit any one individual, company, or corporation to become indebted to the bank at any time in a sum exceeding 25 per cent. of its capital actually paid in including its permanent surplus (section 1292); that the directors may appoint and remove the cashier at pleasure; and that the cashier before entering upon the duties of his office shall give sufficient bonds to the bank to be approved by the board of directors conditioned that he shall well and faithfully perform all the duties of his office and hold the bank harmless from any loss occasioned by any of his acts as such officer (section 1294); that it shall be the duty of the Secretary of State at least once in each year, either personally or by one or more competent persons to be appointed by him, to visit and examine every bank organized and doing business under the law of the state, and whenever it shall appear to the Secretary of State from any such examination that any bank is conducting its business in an unauthorized manner, he shall by an order under his hand and seal direct the discontinuance of such illegal and unauthorized practices; and, if unlawful uses of the funds of the bank have been made, he shall require that such amounts shall be restored to it by the person or persons responsible for the wrongful or illegal payment thereof; and, whenever it shall appear that any director or officer has been guilty of misconduct in his official position injurious to the institution, he shall communicate the fact to the Attorney General, who shall thereupon institute such proceedings as the nature of the case may require; and provision is made for the removal of such offending officer and the taking possession of the bank by the Secretary of State whenever he shall deem it advisable to do so (section 1305).

Mr. Quinn as cashier and one of the directors of the bank had approved all of these loans to the bankrupt and permitted it to become indebted to the bank in a sum far in excess of the amount authorized by law. In fact, he and English had permitted the bankrupt to withdraw from the bank nearly $26,000, or within $4,000 of its entire capital and surplus. In so doing they violated the law, disregarded their obligations to the bank, endangered its solvency, and became liable to it under the law for this excessive indebtedness of the bankrupt, and subjected themselves to removal from the management of the bank if they failed to restore or cause to be restored the money they had so unlawfully loaned, and they were being pressed by the bank examiner to make good to the bank this indebtedness. Under these circumstances, Quinn and English agreed to indorse the notes of May 12th. Quinn indorsed all four of the notes at the request of the bank examiner by writing his name on the back thereof, and under the law of Missouri became a guarantor of their payment. Mrs.

English also indorsed them, and English indorsed the three not signed by him. But Quinn was the responsible party whose indorsement added value to the notes. It was the duty of the Secretary of State under the law to institute proceedings against Quinn and the other officers of the bank who had made and approved of these excessive loans to the bankrupt if that indebtedness had not been satisfactorily secured to the bank. The bank examiner was insisting and urging on behalf of the Secretary of State that it be secured, and it is obvious that Quinn by his indorsement of the notes secured the indebtedness to the satisfaction of the bank examiner, who impliedly at least agreed that proceedings against him and the other officers of the bank, and the bank itself would not be instituted because of their official misconduct; they were not instituted, and the bank was permitted to continue in business, Quinn to act as cashier and one of its directors, and the notes so indorsed by Quinn remained unpaid until July 6, 1906, when they were in fact paid by him as one of the guarantors thereof. The liability of Quinn to the bank under the law of Missouri for permitting the bankrupt to incur this excessive indebtedness to it would be a sufficient consideration to support his promise to pay that indebtedness to the bank, and is sufficient to support his indorsement of the notes of May 12th given therefor. Wills v. Ross, 77 Ind. 1, 40 Am. Rep. 279; Stebbins v. County of Crawford, 92 Pa. 289, 37 Am. Rep. 687. But any benefit or advantage accruing to Quinn or to the bank or to the bankrupt because of his indorsement, or the forbearance to enforce any legal or equitable claim against either, is a sufficient consideration to support that indorsement. 1 Parsons, Notes & Bills, pp. 175, 195, 198; National Bank v. Railroad Co., 102 U. S. 14–43, 26 L. Ed. 61; Market Co. v. Kelly, 113 U. S. 199–202, 5 Sup. Ct. 422, 28 L. Ed. 948; Cox v. Sloan, 158 Mo. 411–424, 57 S W. 1052; Jennison v. Stafford, 1 Cush. (Mass.) 168, 48 Am. Dec. 591; Lindell v. Rokes, 60 Mo. 249, 21 Am. Rep. 395; Wolford v. Powers, 85 Ind. 294, 44 Am. Rep. 16; Mascola v. Montesanto, 61 Conn. 50, 23 Atl. 714, 29 Am. St. Rep. 170; Beebe v. Wells, 153 Fed. 133, 82 C. C. A. 285; Atherton v. Marcy, 59 Iowa, 650, 13 N. W. 759.

We think there was ample consideration for Quinn's indorsement of these notes, and that he became liable thereon to the bank, and at the same time a creditor of the bankrupt.

Furthermore, we think that the mortgage to Quinn was made by the bankrupt in contemplation of and as a fraud upon the bankruptcy act, that it was accepted by him for that purpose, and that it cannot be sustained under section 67d of the act. That section reads in this way:

"Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act."

"Good faith," and "not in contemplation of or in fraud upon the bankruptcy act," are of the essence of this subsection, without which the liens therein mentioned cannot be upheld even though there be a present consideration for them. We think that these essentials are lacking in the transaction of June 28th between the bankrupt and

185 F.—29

Quinn, and that the mortgage to Quinn was made by the bankrupt with intent to prefer Quinn and the Jackson Bank within the meaning of section 60b of the bankruptcy act, and accepted by Quinn with reasonable cause to believe that it was so intended. The property covered by the trust deeds to the bank was the same as that covered by the mortgage to Quinn. These trust deeds were made in May, 1905, but were never recorded, for the reason, as Quinn says:

"We did not want the public to know we had made so large a loan to English, therefore they were kept secret and not placed of record, and only the directors of the bank knew of them."

Quinn, English, and the other directors of the bank knew the circumstances under which these trust deeds were made; that the bankrupt was then insolvent; that they were intended by it as a preference to the bank, and were accepted by the bank with reasonable cause to believe that they were so intended. The bank, therefore, could not hold the property under the trust deeds as against the trustee in the event of bankruptcy. It was plainly the purpose, therefore, of Quinn and English by the transaction of June 28th, and of July 6th following, to save to the bank the property covered by the unrecorded trust deeds (but which it had lost because of its failure to record them in due time), under the cover of a new mortgage to Quinn upon the same property for a present consideration, but which was in fact, as the trust deeds were, a preference and therefore in fraud of the bankruptcy law. The estate of the bankrupt was not enhanced in the least by this transaction, and its only purpose was to substitute Quinn as its sole creditor, instead of the bank with Quinn as guarantor of its indebtedness. It was a clever attempt to evade the provisions of the bankruptcy act, and if permitted to succeed would work a plain fraud upon that act. Mr. Quinn did not place his mortgage of record until August 8, 1906, at 6:10 p. m., the evening before the attachment suit of the Sturdivant Bank against the bankrupt was commenced. He says the reason that he did not record it when it was made was:

"That English requested that it be not placed of record because his interests were so interwoven with the bank that placing it on record would shatter the confidence of the community in the bank. Another reason was to give English an opportunity to consummate a deal in St. Louis."

But one conclusion can be drawn from this statement of Mr. Quinn, and that is that he knew, when he took the mortgage of June 28th, of the insolvency of the bankrupt corporation, that the mortgage was intended as a preference for his own benefit and that of the bank, and as a shield to the bankrupt while its president was negotiating a deal in St. Louis, and was to be placed of record only in case a situation should arise making it necessary to do so, and that he accepted it with that in view and with reasonable cause to believe that it was intended as a preference, and with actual knowledge that it was in contemplation of a fraud upon the bankruptcy act. We are therefore of the opinion that the mortgage to Quinn cannot be sustained under section 67d, and is void under section 60b of the bankruptcy act. See Powell v. Gate City Bank, 178 Fed. 609–611, 102 C. C. A. 55.

The District Court adjudged that Quinn's mortgage was made in violation of section 67e of the bankruptcy act and void. It reached this conclusion mainly upon the ground that the withholding of the mortgage from record at the instance of English was sufficient evidence of an intent upon the part of both Quinn and English to hinder, delay, and defraud the creditors of the bankrupt corporation within the meaning of that section. That the mortgage would be void as to those creditors, if any, who extended credit to the bankrupt after it was made and before it was recorded, seems clear. In re Bothe, 173 Fed. 597, 97 C. C. A. 547; Central Bank v. Doran, 109 Mo. 40, 18 S. W. 836. But to avoid the mortgage under section 67e as to other creditors actual fraud in which Quinn participated, as distinguished from a mere preferential transfer or constructive fraud, must be shown. Coder v. Arts, 213 U. S. 232–242, 53 L. Ed. 772.† There is much force in the contention that the evidence shows that the mortgage to Quinn was made in actual fraud of the creditors of the bankrupt within the meaning of section 67e of the bankruptcy act, and void under that section. But we need not determine this question, for our conclusion that the mortgage was made as a preference under section 60b of the act, and in contemplation of and in fact a fraud upon that act, results in its avoidance for that reason, and the affirmance of the decree upon that ground.

The decree is therefore affirmed.