CHAPMAN v. HUNT.

In re SYRACUSE CANDY WORKS, Inc.

(District Court, N. D. New York.   January 24, 1918.)

1. BANKRUPTCY ⬦⟹159—PREFERENCES—"CREDITORS"—WHO ARE.
   A surety or indorser for a bankrupt is a "creditor," within the meaning of Bankruptcy Act July 1, 1898, c. 541, 30 Stat. 544.

2. BANKRUPTCY ⬦⟹166(1)—PREFERENCE—RECEIPT OF PREFERENCE.
   Where an indorser or surety on the note of a bankrupt, within four months of bankruptcy, knowing of the bankrupt's insolvency, induces him to pay the note, with the intent of escaping liability and thus obtaining a preference over other creditors of the same class, such surety or indorser receives a preference, which may be recovered by the trustee in bankruptcy.

3. BANKRUPTCY ⬦⟹175—PREFERENCES—FRAUDULENT TRANSFER.
   A transaction by a bankrupt may be invalid, both as a preference and as a fraudulent transfer, to hinder, delay, or defraud creditors.

4. BANKRUPTCY ⬦⟹166(1)—PREFERENCES—WHAT ARE.
   Defendant, the president and one of the directors of a corporation, sold his stock and resigned his offices.   At that time he was an indorser of certain notes of the corporation.   To protect him on his contingent lia-bility the corporation assigned to him certain accounts; the agreement allowing the corporation to collect the accounts and substitute others. This plan was continued for over a year, at which time defendant, ascer-taining that the corporation was in financial difficulties, induced its man-ager to cease operations, curtail expenses, and turn in the book accounts to him as fast as they were collected.   Shortly thereafter defendant ad-vanced the corporation a sum of money, which with a small portion of its own funds was used in discharging notes on which defendant was con-tingently liable.   As part of the same transaction the corporation ex-ecuted in favor of defendant a note for the sum advanced and deposited

⬦⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

new accounts as security. At this time defendant knew of the corporation's insolvency, and his intention was, not to assist the coroporation to continue business, but to save himself. *Held*, that the second assignment of accounts, which occurred within four months of bankruptcy, was subject to attack by the trustee as preferential; defendant by that means obtaining a preference over other creditors, and the transaction not being an independent one, which could be sustained as a purchase of the accounts or loan to the corporation.

5. BANKRUPTCY ☞175—TRANSFERS TO HINDER, DELAY, AND DEFRAUD.

In such case, as the transfer would necessarily deprive other creditors of the benefit to be secured by the Bankruptcy Act, it was invalid, as one to hinder, delay, and defraud creditors.

6. BANKRUPTCY ☞188(3)—TRANSFERS SUBJECT TO ATTACK—EQUITABLE LIEN.

In such case, defendant is not entitled to an equitable lien for, or to offset against, the recovery on account of the preferential and fraudulent transfer of sums collected, and which he allowed to be used for running the business of the bankrupt, and payment of rent, etc.

7. BANKRUPTCY ☞95—REFERENCE—COMPLICATED ACCOUNTS.

Where a bankrupt's last assignment of accounts was preferential, and the transaction was very complicated, the accounts should be submitted to a special master, to determine the disposition and state the same.

8. BANKRUPTCY ☞175—PREFERENCES—WHAT ARE.

Where defendant, the president and director of a corporation, sold his stock and resigned, and to protect him from his contingent liability as indorser of corporate notes, the corporation assigned to him accounts due, the agreement allowing the corporation to collect such accounts and substitute others, such agreement, defendant having collected and reduced some of the accounts to possession, is not, the corporation thereafter becoming a bankrupt, subject to attack; it appearing that when it was entered into the corporation was solvent, and there was no intention to prefer defendant or to hinder, delay, and defraud creditors.

9. BANKRUPTCY ☞188(3)—EQUITABLE LIENS—RIGHT TO.

In such case, where defendant, on discovering that the bankrupt was in financial difficulties, advanced funds to enable it to discharge the notes on which he was contingently liable as indorser, and the sum advanced was commingled with the general property of the corporation, although the notes were discharged, defendant is not, the whole transaction having been in fraud of creditors, entitled to any equitable lien on account of the amount advanced.

In Equity. Suit by George D. Chapman, as trustee in bankruptcy of the Syracuse Candy Works, Incorporated, against Edward A. Hunt. Finding for plaintiff, and cause directed submitted to special master to state accounts, with decree to be entered on the master's report.

The action is in equity to recover of the defendant certain money alleged to have been received by him of the bankrupt as a preference, and also in fraud of the creditors of said bankrupt, and also to determine title and right to certain money in the hands of the said trustee in bankruptcy, and in a certain deposit known as "Partial Payment Account" claimed by defendant to belong to him. The case is submitted on two stipulations as to the facts accompanied by the voluminous exhibits in the case.

Lee & Brewster, of Syracuse, N. Y., for plaintiff.
Levi S. Chapman, of Syracuse, N. Y., for defendant.

RAY, District Judge. June 5, 1916, the Syracuse Candy Works, a New York corporation having its place of business at Syracuse, N. Y., where it was engaged in the business of manufacturing and selling candy, was duly adjudicated a bankrupt, and George D. Chapman was thereafter in due course appointed trustee of the bankrupt's estate and duly qualified as such. The petition was filed May 13, 1916.

The Syracuse Candy Works, which for brevity may be called Candy Works, was incorporated in 1912. The defendant, Edward A. Hunt, was one of the incorporators, and acted as president and. one of the directors thereof until January, 1915, when he sold his stock and resigned as president and director. At the time of such resignation by Hunt he was indorser on certain promissory notes of the Candy Works, held by the City Bank of Syracuse, N. Y., aggregating in amount $9,900. Hunt was contingently liable thereon for the full amount thereof because of such indorsements.

On the 13th day of January, 1915, an agreement was made between the said Candy Works and said Hunt, of which the following is a copy:

"For value received, we, the undersigned, Syracuse Candy Works, Inc., a domestic manufacturing corporation, having its principal place of business in the city of Syracuse, N. Y., does hereby sell, assign and transfer and set over unto Edward A. Hunt, of the city of Syracuse aforesaid, the accounts owned by this corporation against the persons, firms and corporations set forth in the annexed schedule and for the amounts set opposite the name of each. And we do hereby give unto the said Edward A. Hunt full power and authority to collect and enforce the same and for that purpose to take any steps that we might take had this assignment not been made.

"The purpose of this agreement is to secure the said Edward A. Hunt by reason of his indorsement of certain notes of said corporation at the City Bank of Syracuse, and this assignment shall remain as continuing collateral security for the protection of the said Edward A. Hunt on account of such indorsement and on account of any further indorsements he may make on any of the notes of said company or any renewals thereof in whole or in part. It is further agreed, on the part of said Edward A. Hunt and on the part of said Syracuse Candy Works, Inc., that Miss Thelma Smith, who is now the treasurer of said corporation, shall act as the representative of the said Edward A. Hunt in receiving and collecting said accounts, and that she may turn over to said company the proceeds of any account collected by her, by assigning to said Edward A. Hunt an equal amount, or as near an equal amount as practicable, of new and good accounts in favor of the said Syracuse Candy Works, Inc., so that there shall always be and remain in the name of said Edward A. Hunt good accounts in favor of said Syracuse Candy Works, Inc., and assigned to him in the aggregate amount of about $6,000.

"For the purpose of carrying this agreement into execution, for each new account created in favor of said Company and against any of the persons, firms or corporations mentioned in said schedule, or against any other persons, firms or corporations, duplicate statements shall be made out, one of which shall be delivered to the said Edward A. Hunt with the following stamped thereon.

" 'For value received the undersigned, Syracuse Candy Works, Inc., does hereby sell, assign and transfer the within mentioned accounts to Edward A. Hunt in accordance with the terms and conditions of our agreement with said Hunt, bearing date January 13, 1915."

" 'Dated Jany. 13, 1915.        Syracuse Candy Works, Inc.,
" 'By G. F. Rowe, President.
" 'Thelma M. Smith, Treasurer.'

"We do also agree that we will execute any other or further papers or agreements that may be necessary to carry this assignment or the assignments

of any other accounts substituted for these accounts or substituted for any accounts that may be substituted for these accounts.

"In witness whereof, we have hereunto caused this instrument to be signed by the president and treasurer of its company and its corporate seal affixed the day and year above written.

"[Seal.]    Syracuse Candy Works, Inc.,
"By G. F. Rowe, President.
"Thelma M. Smith, Secretary."

It is seen by the terms of this agreement that it was the purpose to have the Candy Works continue business, have the money applied to the conduct and running of the business when collected on the assigned accounts, and other and new accounts due the Candy Works substituted from time to time. This agreement was not filed or recorded, and the then and subsequent creditors of the Candy Works were not notified of its existence. Annexed to the agreement at the time of its execution was a list of accounts aggregating in amount $5,931.85. Thereafter, up to April 1, 1916, on or about the 1st day of each month, similar lists of accounts, Exhibits 2 to 16, inclusive, were made out and delivered, with assignments thereof, to the defendant.

Exhibit 2 aggregates in amount $5,438.56.
"    3    "    "    "    $4,964.66.
"    4    "    "    "    $4,362.92.
"    5    "    "    "    $3,712.40.
"    6    "    "    "    $4,044.81.
"    7    "    "    "    $4,043.42.
"    8    "    "    "    $4,015.99.
"    9    "    "    "    $3,667.91.
"    10   "    "    "    $4,044.75.
"    11   "    "    "    $4,639.82.
"    12   "    "    "    $4,121.50.
"    13   "    "    "    $4,541.54.
"    14   "    "    "    $4,549.78.
"    15   "    "    "    $3,818.79.
"    16   "    "    "    $3,669.74.

April 18, 1916, another assignment of accounts, with a list attached, aggregating in amount $3,002.18, was executed and delivered by said Candy Works to the defendant, of which agreement the following is a copy:

"For value received, we do hereby sell, assign and transfer to Edward A. Hunt, of the city of Syracuse, Onondaga county, N. Y., all of the following accounts due and owing to us and do hereby give unto said Hunt full right and authority to receive and collect the same and for that purpose to take any and all steps in our name or otherwise that we could take had this assignment not been made. This assignment is given to said Hunt as collateral security for the payment of our notes to him bearing even date herewith in the amount of $8,600, payable on demand to his order at the City Bank of Syracuse, and for any and all renewals thereof in whole or in part.

"In witness whereof we have hereunto caused this instrument to be signed by our president and our corporate seal to be affixed this 18th day of April, 1916.

"[Seal.]    Syracuse Candy Works, Inc.,
"By G. F. Rowe, President.

"In the presence of."

This stipulation of facts then reads:

"The debtors of the Syracuse Candy Works, Incorporated, whose accounts were assigned to Edward A. Hunt as above stated, were not notified of these assignments. No record of them was made upon the books of the Syracuse Candy Works, and the moneys which were collected upon such accounts were deposited to the credit of the Syracuse Candy Works, Incorporated, in the City Bank of Syracuse, where the corporation had an account, and the moneys were used for the purpose of the corporation business, without interference or objection upon the part of defendant, until about April 3, 1916. The defendant had frequent reports as to the financial condition of the Candy Works and knew for three or four months previous to April, 1916, that the corporation was in financial difficulties. The defendant is a director of the City Bank of Syracuse and a member of the discount committee. Levi Chapman, one of defendant's attorneys, is attorney for the City Bank, and was also attorney for the Syracuse Candy Works, Incorporated.

"On or about the 3d day of April, 1916, George F. Rowe, the president and general manager of the Syracuse Candy Works, Incorporated, met defendant by appointment at the office of defendant's attorney, where the affairs of the corporation were discussed. Defendant's attorney stated to Rowe that the defendant was not satisfied with conditions and that defendant thought he should be protected, and Rowe was instructed to close down the factory, curtail expenses, and turn in the book accounts to defendant as fast as they could be collected. As a result Rowe returned to the factory and arranged his work to carry out these instructions, and on Friday night, April 7, 1916, he laid off all the factory help, except Thelma M. Smith, who was in the office, and one man and one woman worked in the factory a few days after that, to finish up some of the work which was on hand."

April 1, 1916, the Candy Works owed the City Bank $9,800 on a series of notes, on which the interest had been paid in advance, but April 13, 1916, one of these notes due that day was reduced from $2,500 to $1,800 by a payment of $700 taken from the account known as the "Partial Payment Account," and which account was opened by said Candy Works with said City Bank at the instance of the defendant on the 11th day of April, 1916, and into which thereafter was deposited all moneys received and deposited by the Candy Works or by defendant, except as follows: Deposit of April 11, 1916, of $568.41, against which a check of $473.68 was drawn the same day, and which represented a sugar transaction by which the Pennsylvania Sugar Company was paid said $473.68 for sugar, which brought $568.41, and the difference, the profit in the transaction, went into the general bank account of the Candy Works; April 18, 1916, defendant gave the Candy Works his check for use by it in payment of its notes held by the City Bank for $8,600, and on the same day the Candy Works drew its check to the City Bank for $8,622.50 for such purpose; April 22, 1916, a deposit of $576.59 was made by the Candy Works, and on the same day a check was drawn against this for $509.75, payable to the Pennsylvania Sugar Company. This sugar transaction was similar to the one heretofore mentioned. All moneys received on accounts which had been assigned to the defendant by the Candy Works, money derived from the sale of tools, furniture, and fixtures, sales of candy, and also currency and a few items, the source of which is not fixed, were deposited in this partial payment account. The balance of said $2,500 note was paid by a demand note of the Candy Works for $1,800, dated April 13, 1916, and indorsed by Hunt. In addition to the note of $1,800, heretofore and above mentioned, the

Candy Works owed the City Bank $7,300 on its notes, making $9,100. These notes were dated and for the amounts following:

Exhibit 22, February  6, 1916, $1,600.
   "    23,    "     11,   "   $ 650.
   "    24,    "     21,   "   $1,200.
   "    25,    "     28,   "   $2,350.
   "    26, March    1,   "   . $1,500.

Each was a time note, due three months from date, and indorsed by E. A. Hunt, the defendant. On said 18th day of April, 1916, Mr. G. F. Rowe, the president and general manager of said Candy Works, was called into conference by the defendant and his attorney, and this conference resulted: (1) The defendant gave his said check for $8,600, hereinbefore mentioned, to the said Syracuse Candy Works, taking therefor its demand note for $8,600 and also the assignment of accounts heretofore mentioned, made that day. This check, as in effect hereinbefore stated, was deposited in the general account of the Candy Works in said bank, and the check for $8,622.50, payable to the City Bank, was drawn against it, and $477.50 in addition was taken from this "Partial Payment Account," without a check (evidenced by a charge slip), making in all $9,100, and this $9,100 was paid to the said City Bank in payment of the notes then held by said bank, made by said Candy Works. Neither one of the said notes so held by the bank was then due, except the $1,800 demand note above mentioned. Says the stipulation of facts:

"This transaction was carried through by defendant at the request and suggestion of the City Bank."

It is evident that the transaction resulted in the payment of all notes of the Candy Works on which this defendant was contingently liable as indorser or otherwise. The defendant was now owing the City Bank $8,600, and the Candy Works was owing defendant that sum on such note. April 29, 1916, the Candy Works drew a check reading as follows:

"The City Bank, Syracuse, New York, 4/29, 1916. Pay to the order of Partial Payment Account $1,400, fourteen hundred and 00/100 dollars. Syracuse Candy Works, T. M. Smith, Treasurer. G. F. Rowe, President. No. 2074."

This check was delivered to the said City Bank, and thereupon $1,400 was taken from the partial payment account at defendant's direction and the money applied on the indebtedness of defendant to the City Bank and credited by defendant on the $8,600 demand note, which defendant still held. May 9, 1916, $728.26 was withdrawn from the partial payment account at defendant's direction, without a check, and applied in part payment of defendant's indebtedness to the City Bank, who in turn credited that amount on said $8,600 note. All payments and withdrawals from the partial payment account were made solely upon defendant's direction, and the Candy Works had no control over such account.

By stipulation dated September 27, 1917, it is agreed that the said Syracuse Candy Works was in fact insolvent from December, 1915,

until the filing of the petition in bankruptcy, May 13, 1916, its condition of insolvency growing constantly worse; also that "defendant Edward A. Hunt knew for the entire period from December, 1915, until the Syracuse Candy Works, Incorporated, was petitioned into involuntary bankruptcy on the 13th day of May, 1916, that the Syracuse Candy Works, Incorporated, was in financial difficulties." April 18, 1916, the said City Bank held the said notes of the Candy Works for said $9,100, on all of which Hunt was indorser.

The facts stipulated, in connection with the exhibits in evidence, show and establish:

I. That at all times from December, 1915, down to the date of the filing of the petition in bankruptcy, May 13, 1916, the Syracuse Candy Works, Incorporated, was actually insolvent, and well knew the fact.

II. The defendant, Edward A. Hunt, during all of that time, from December, 1915, to the date of the filing of the petition May 13, 1916, well knew the said Syracuse Candy Works was insolvent, in financial difficulties, and unable to pay its debts in full. This fact is established beyond all possible controversy as to the period of time from and after April 11, 1916.

III. During all of the time from December, 1915, down to the day the petition in bankruptcy was filed, the defendant, Edward A. Hunt, within the meaning of the Bankruptcy Act, was a creditor of the Syracuse Candy Works, now bankrupt, by reason of his indorsements and liability as indorser on its said promissory notes held by the City Bank of Syracuse, and from and after April 18, 1916, by reason of his giving his check for $8,600 to said Syracuse Candy Works, Incorporated, and taking its promissory note therefor, and his indorsement on its notes.

IV. Virtually he took possession of the financial affairs of the said Syracuse Candy Works and controlled and directed them, and directly in the manner stated procured and caused the payments of money hereinbefore and hereafter mentioned to be made by the Syracuse Candy Works, Incorporated, to said bank, for the purpose of reducing and to that extent extinguishing his liability to said City Bank of Syracuse as such indorser, as well as the liability of said Syracuse Candy Works, Incorporated, on such notes held by the bank, on which he was indorser, and on and after April 18, 1916, took or procured to be taken the money of said Syracuse Candy Works, Incorporated, in such partial payment account, and applied it or caused it to be applied, directly or indirectly, on such notes and on the note held by him, so given by said Syracuse Candy Works, for $8,600, thus obtaining the benefit of all such payments in reduction of the liability of said Syracuse Candy Works, Incorporated, to the bank and to himself. This was his purpose.

V. When such moneys were taken, and so used and applied, said defendant, Edward A. Hunt, had reasonable cause to believe, and in fact well knew, that such payments and applications of such moneys so directed, caused, and procured by him would operate as a preference, and that he was to be benefited thereby, and that such transfer and payment of such money to said bank would cause and effect a preference. I discover no escape from these conclusions.

[1] A surety or indorser for a bankrupt is a creditor within the meaning of the Bankruptcy Act of July 1, 1898, c. 541, 30 Stat. 544. Kobusch v. Hand, 156 Fed. 660, 84 C. C. A. 372, 18 L. R. A. (N. S.) 660; Brown v. Streicher (D. C.) 177 Fed. 473; In re Silvernail Co. (D. C.) 218 Fed. 979; Paper et al. v. Stern, 198 Fed. (C. C. A. 8th Circuit) 642, 644, 117 C. C. A. 346; McAtee v. Shade, 185 Fed. 442, 447, 107 C. C. A. 512; Swarts v. Siegel, 117 Fed. 13, 17, 54 C. C. A. 399; Amundson v. Folson, 219 Fed. 122, 125, 135 C. C. A. 24; Huntington v. Baskerville, 192 Fed. 813, 817, 113 C. C. A. 137.

[2] And when a surety or indorser on the note of a person or corporation who is insolvent knows of such insolvency within four months of bankruptcy, filing the petition, causes or procures him or it to pay the note or notes upon which he is indorser, in whole or in part, for the purpose of or with the intent to relieve or exonerate himself from liability, and thus obtain a preference over other creditors of the same class, he receives a preference, which may be recovered by the trustee in bankruptcy. Kobusch v. Hand, 156 Fed. 660, 84 C. C. A. 372, 18 L. R. A. (N. S.) 660; Brown v. Streicher (D. C.) 177 Fed. 473; In re W. A. Silvernail Co. (D. C.) 218 Fed. 979; Paper v. Stern, 198 Fed. 642, 117 C. C. A. 346; McAtee v. Shade, 185 Fed. 442, 447, 107 C. C. A. 512; Huntington v. Baskerville, 192 Fed. 813, 817, 113 C. C. A. 137; Stern v. Paper et al. (D. C.) 183 Fed. 228, 231.

[3-7] There is no evidence that when the first agreement above recited, providing for the assignment of accounts to Hunt, the defendant, as security for his indorsements, and the use of the money collected on such accounts by the Candy Works in carrying on its business, and the assignment of other subsequently accruing accounts in their place, that Hunt knew of the insolvency of the Candy Works, or even that that company was then insolvent. The agreement was good as between the parties thereto. The Candy Works received the money on the accounts assigned and collected from time to time, and used them. Once each month, and on or about the 1st of each month, assignments of other accounts were made. The petition in bankruptcy was not filed until May 13, 1916. In the meantime, and up to April 18, 1916, certainly, the parties were operating under the agreement of January 13, 1915, so far as appears, although not in strict compliance therewith, and in the meantime the Candy Works became insolvent, and defendant knew this fact. The assignment of accounts, made on the 18th day of April, 1916, was a new arrangement and agreement. On that day defendant gave the Candy Works his check for $8,600, for the purpose, evidently, of taking up and paying all its notes held by the bank and releasing defendant as indorser thereon, and which had been reduced to $8,622.50, and the proceeds of this check were used by the Candy Works, with $22.50 of its own money, for that purpose, so that the liability of defendant as indorser was canceled and the liability of the Candy Works on the old notes held by the bank, not then due, except as to one, was extinguished. The direct relation of debtor and creditor then came into existence between defendant and the Candy Works by the loan of this $8,600 by defendant and the execution and delivery to him of the note of the Candy Works for that amount. As a part of this transaction of April 18, 1916, the assignment of accounts

of that date was made "as collateral security" for the payment of said note of $8,600. This note was given, however, to represent a loan that day made by defendant, to be used to extinguish his liability as indorser for the Candy Works at the the bank on the notes mentioned. In this indirect way the defendant was using his own money to extinguish the obligations of the Candy Works to the bank, and thereby his own liability thereon as indorser. By assignment of accounts belonging to the Candy Works, he took security for this loan, represented by this note of the Candy Works of $8,600.

If this loan, a present full consideration for the note and assignment of accounts as security, had been a present and an independent transaction had in good faith, even if made to relieve the Candy Works in its financial difficulties, it could not be impeached or questioned. Dean v. Davis, 242 U. S. 438, 37 Sup. Ct. 130, 61 L. Ed. 419. But it was a transaction had for the purpose of and intended to release the obligation of defendant to the bank as indorser for the Candy Works, and transfer the accounts due and owing to the Candy Works, its property, to defendant as security for the money of defendant used in this indirect way to take up the notes. The amount of the liability of the Candy Works remained the same, less the $22.50; but the obligation of this defendant to the bank was released or canceled, and he received the note of the Candy Works, with the assignment of accounts due and owing the Candy Works as security. Suppose Hunt, the defendant, had gone to the bank and paid the notes on which he was indorser with his own money, and then as owner and holder thereof had taken the assignment of accounts as security, how would the transaction differ in legal effect from what was actually done? The defendant was in effect obtaining, and did obtain, by means of such assignment of accounts, security for his pre-existing liability as indorser at a time when he knew the Candy Works was insolvent. He was in fact securing a preference by obtaining this assignment of accounts. The estate of the bankrupt was not benefited or increased by the loan of the defendant's check, and its application to the payment of the notes at the bank, and the giving of the note to Hunt. The only one actually benefited was Hunt, this defendant, as the transaction resulted in his release as indorser, the application of $22.50 of the Candy Works' money to the purpose, and the assignment of these accounts to defendant by the Candy Works at a time when Hunt knew this Candy Works was insolvent.

But it is asserted that the defendant was thus obtaining the assignment of accounts under and pursuant to the agreement of January 13, 1915, entered into at a time when the Candy Works was perfectly solvent, so far as appears or is claimed; that no filing, record, or publication of such assignment was necessary to its validity as against general creditors or creditors without a specific lien; that there was an equitable lien created in favor of the defendant, which ripened into actual possession of some of the accounts pledged or assigned, or their proceeds, prior to the filing of the petition in bankruptcy; and that the preference thus obtained is not voidable by the trustee in bankruptcy.

It must be remembered that this is not a case where the defendant advanced money to purchase specific property, upon which he was to

have a lien as security, or to pay or release a lien or charge on property purchased by the Candy Works, with an agreement that he should have a lien on such property, when obtained, for such advance or loan. The indorsements were made to enable the Candy Works to obtain money at the bank to use generally in carrying on its business. The defendant, Hunt, had no lien on the merchandise purchased or manufactured. There was no attempt to create one thereon. If it had been mortgaged or pledged, the business to continue, such mortgage or pledge on such merchandise, unless accompanied by delivery, would have been void as to creditors and the trustee in bankruptcy. Hence resort was had to the assignment of, and agreement to assign, accounts as security for the indorsements. It seems to me that on the authority of Dean v. Davis, 242 U. S. 438, and the cases cited in the note, page 445, 37 Sup. Ct. 130, 61 L. Ed. 419, it is my duty to hold, and that I am required to hold, and do hold and find, that the transfer or assignment of accounts made by the Syracuse Candy Works, Incorporated, to the defendant, Edward A. Hunt, on the 18th day of April, 1916, was not only a preference, but void as in fraud of the creditors of the Candy Works, and that the transaction of April 18, 1916, was intended to hinder, delay, and defraud the general creditors of the Syracuse Candy Works, Incorporated. Clearly the Syracuse Candy Works on that day was not assigning, and the defendant Hunt was not seeking an assignment of, accounts which it already owned, or to which it had and asserted a right under the agreement of January 13, 1915. Besides this, the assignment made April 18, 1916, was not made to secure the defendant for his indorsements on notes made by the Candy Works and held by or discounted at the bank, but as security for a new obligation, the note of $8,600, given for the check of Hunt, and given under the circumstances recited. Clearly it was the intent and purpose of both parties to the transaction to release the defendant as indorser, and to pay him, a creditor, to the exclusion of the other creditors of said Candy Works. These notes at the bank, with one exception, were not due, and the assignment included practically all the property of the Candy Works. Says the court in Dean v. Davis, supra:

"A transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act, 'hinders, delays or defrauds creditors,' within the meaning of section 67e" of that act.

Also:

"A transaction may be invalid both as a preference and as a fraudulent transfer."

Here there was no hope or expectation that the Candy Works could or would extricate itself from its financial difficulties or continue business. In point of fact, says the stipulation of facts, as already quoted, April 3, 1916, the president and general manager of the Candy Works was instructed to close down the factory, curtail expenses, and turn in the book accounts to defendant as fast as they could be collected. Rowe carried out the instructions, and April 7, 1916, laid off all the factory help, except Thelma Smith, who was in the office and had charge of the accounts, and one man and one woman, who worked a few days to close up some of the unfinished work on

hand. This was practically a cessation of business at the instigation and procurement of the defendant and with the assent of the Candy Works.

I think and hold the trustee in bankruptcy is entitled to recover and receive the proceeds of all the accounts assigned April 18, 1916, and also the proceeds of some which were not in either assignment, including both the proceeds thereof 'paid over or applied and those remaining either in the partial payment account or collected and not placed in that account; also the profits on three sugar deal transactions, $94.73, $66.84, and $301.88, and also the $22.50 taken from the general account to take up the notes at the bank in excess of the $8,600 represented by the check of Hunt, and $21.60 recovered on account of L. K. Liggett. As near as I can ascertain, the collections on accounts not in any assignment, which went into the partial payment account, aggregated $1,154.31. The defendant's claim of an equitable lien on and offset of items, $100, $43.35, $342.53, $393.95, and $124.80, cannot be allowed. The defendant consented to and acquiesced in the use of the money collected for running the business and payment of rent, etc., and cannot recover same of the trustee on any theory. The plaintiff is entitled to recover the collections, amounting to $702.76, now in the special deposit account, and which came from the accounts, as I understand, assigned April 18, 1916.

From the mixed accounts and date before me I am unable to fix the amount collected from the accounts assigned April 18, 1916, without great danger of error and duplication, and this matter should go to a special master to determine same, and also the disposition and whereabouts of same, and generally to take and state an account of the sums recoverable under this decision. For that purpose it is referred to Hon. C. L. Stone as special master.

[8, 9] I discover no theory on which I can hold the first agreement, and the assignments of accounts made pursuant thereto, invalid. Clearly the defendant had an equitable claim thereto and an equitable lien thereon, and by deposit and actual application to the purposes contemplated before bankruptcy had reduced much of same to possession. If any of the proceeds of such account remained in the partial payment account at the time of the filing of the petition in bankruptcy, the special master will report that fact and the amount thereof, as the trustee may recover it. The proceeds of those accounts was to be applied on the notes indorsed by Hunt. Such notes were otherwise paid, and Hunt took the note of the Candy Works. That agreement was made when the Candy Works was solvent, and there is nothing to show it was made to cheat, hinder, delay, or defraud creditors. The fact that the Candy Works become insolvent long prior to April 18th, and that the parties continued to operate under that agreement, cannot make it invalid.

To make the position and holding of the court perfectly clear as to the assignment of accounts made April 18, 1916, perhaps this should be added. In Dean v. Davis, 242 U. S. 438, 37 Sup. Ct. 130, 61 L. Ed. 419, supra, the Supreme Court held:

"A transfer of property by an insolvent, made to secure a contemporaneous loan of money which the lender advances, and the insolvent obtains and uses,

for the discharge of a pre-existing debt of the insolvent to a third party, in which the lender has no interest, is not a preference of the lender within section 60b of the Bankruptcy Act, as amended February 5, 1903, 32 Stat. 797, 800."

In the instant case the defendant, Hunt, the lender, who advanced the money, $8,600, to take up the notes at the bank on which he was indorser, did have an interest in the pre-existing debt of the Candy Works and in the payment thereof, as he was liable therefor, and in legal effect, because of such indorsements, it was his own debt to the bank, as well as the debt of the Candy Works. Both were liable therefor. Therefore, when Hunt loaned the money to the Candy Works by his check to that company to take up such notes, on which he was indorser, taking the note of the Candy Works for such loan of money and the assignment of accounts of the Candy Works as security for the payment thereof, he, the lender, was preferred over the other creditors of the bankrupt, inasmuch as, because of his indorsements, he was a creditor of the bankrupt, as we have seen. See cases cited supra.

He first made the Candy Works the owner of the $8,600, and then directed and procured its application to the payment of his obligation as indorser. The accounts due and owing to the Candy Works under the agreement of 1915 were assigned to the defendant for a specific purpose, and no other—as security for his indorsements on the notes of the Candy Works held by the bank. Hunt was not the absolute owner of those accounts. If the notes indorsed by him were paid before the money due on such accounts was collected, his right thereto ended. He furnished money to the Candy Works, $8,600, by his check to the Candy Works, payable to it, and that company placed and commingled this money with its other funds in bank, and the identity was lost. It, with $22.50, other money of the Candy Works, was paid to the bank in payment of such notes by defendant's direction and procurement. Many of the accounts remained uncollected, and perhaps some of the money already collected was in the "Partial Payment Account" in the name of the Candy Works and subject to its check. It was not used to pay the notes indorsed by Hunt, and the transaction was being carried on for the purpose of securing an assignment of accounts by way of security for the note of $8,600, in fraud of creditors and to secure a preference. By what right could the defendant, Hunt, thereafter appropriate that money in the partial payment account, or thereafter collected on accounts to any other purpose than that specified in the agreement of 1915? If he owed the bank, and it seems from the stipulated facts that he did, could he appropriate the "Partial Payment Account," or the proceeds of the collection of accounts assigned as security for his indorsements, which had been extinguished in other ways, to the payment of his indebtedness at the bank, as against the general creditors of the Candy Works, and do this at a time when the Candy Works had become insolvent and the fact was well known to him? I think not. All trace of the $8,600 was lost when it entered the stream of the Candy Works' general property in its bank account, and there could be no subrogation, or transfer of the defendant's lien on the accounts, or their proceeds, as security for his indorsements, to him, as security for the liability

of the Candy Works to defendant on the note of $8,600. There was no agreement that this should be done. Aside from this, the whole scheme of April 18, 1916, was in fraud of the creditors of the Candy Works. By the loan of the $8,600 to the Candy Works defendant expected and intended to have the notes held by the bank paid, and his liability as indorser extinguished, and also secure additional security.

In National City Bank v. Hotchkiss, 231 U. S. 50, 34 Sup. Ct. 20, 58 L. Ed. 115, it is held:

"Although a loan may be made for a specified purpose, if the lender places it in the stream of the borrower's general property, there is no right of subrogation. A general creditor may increase the bankrupt's estate by his advances and lose the right to take them back."

This case is not in point exactly, but I think the principle applies here. Clearly the defendant cannot be allowed to better himself by this transaction of about April 18, 1916, planned and consummated at a time when he was knowingly seeking to obtain a preference over the other creditors of the Candy Works forbidden by the Bankruptcy Act.

It may be said that Hunt, the defendant, should not lose any equitable right he had in the accounts assigned prior to April 18, 1916, or the collections made and placed in the "Partial Payment Account," by reason of what was done at that time; but if he saw fit to abandon any rights he had by what was then done, or did, he, and he alone, is responsible. The general creditors are not to suffer.

On the coming in of the special master's report, a decree can be entered.