## FINEFROCK v. KENOVA MINE CAR CO. et al.

Circuit Court of Appeals, Fourth Circuit. January 14, 1930.

No. 2879.

Connor Hall, of Huntington, W. Va., for appellant.

Douglas W. Brown, of Huntington, W. Va. (Cary N. Davis and Fitzpatrick, Brown & Davis, all of Huntington, W. Va., on the brief), for appellees.

Before WADDILL and PARKER, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. This case was before the court on an earlier appeal reported in 22 F.(2d) 627. As will there appear, a bill in equity was originally brought by James E. Finefrock, of Ohio, a creditor, for himself and all other creditors in like circumstances, against the Kenova Mine Car Company, the First Huntington National Bank, corporations of West Virginia, and H. S. King, trustee, and G. D. Miller, citizens of that state, the jurisdiction of the court being based on diversity of citizenship. The bill of complaint was filed to secure a decree restraining the sale of certain property covered by a deed of trust executed by the Mine Car Company to the bank, and to cancel the deed of trust. The deed covered all of the property of the company except certain machines, and was given to secure an issue of bonds in the sum of $150,000. The trustee named in the deed of trust was the bank, but the latter, having acquired ownership of the bonds in its individual capacity, had been replaced as trustee by the defendant H. S. King. The deed was executed on July 10, 1922, whereupon it was delivered to the bank, as trustee, together with the bonds. At or about the same time, the company applied to the bank for an additional loan, and on July 27, 1922, a new loan of $29,500 was made which brought the total indebtedness of the company to the sum of $100,000. In order to secure the new loan, the bank required that the mortgage bonds be deposited with it as security, not only for the additional loan, but also for the antecedent indebtedness. The new money advanced, amounting to $29,500, was used by the company to pay a note to the bank of $3,500, and the balance for other company purposes. During this period, the Mine Car Company was not able to meet its current obligations. Whether its assets were equal in amount to its indebtedness depended upon the proper valuation of

its buildings and machinery. Its financial condition grew worse after the execution of the deed, and in 1926, at the time of the hearing in the District Court, it was insolvent in every sense of the word.

No proceedings were brought to test the validity of the transfer of the bonds to the bank until July 28, 1925, when Finefrock filed the pending suit. The complaint was rested on two grounds: (1) That the deed of trust was invalid from its inception, because it was authorized at a meeting of stockholders illegally held, and (2) that the bank had been guilty of a breach of trust in that it had converted, to its own use, bonds which had been delivered to it for the benefit of all of the creditors of the company. After careful consideration of the facts, we held (1) that the corporate meetings, at which the execution of the deed of trust was authorized, were legally held; and (2) that there was no breach of trust by the bank, as trustee under the deed, since the deed was not made for the benefit of creditors, and the appointment of the bank as trustee under the mortgage did not preclude it from acquiring ownership of the bonds. We nevertheless expressly stated that we did not wish to give our approval, in the state of the record then before us, to the course of dealing between the company and the bank, and suggested that, if the complainant could show that there had been a transfer of the property of the company to the bank, with intent to delay, hinder, or defraud its creditors, the complainant might not be without remedy. Adverting to the unusual circumstances of the transfer of the bonds to the bank in its individual capacity, we said:

"Bearing in mind the well-established rules in regard to fraudulent conveyances, it becomes clear that, although the transfer of the bonds to the bank was within the broad language by which the purposes of the trust were described in the deed, it is still pertinent to inquire whether the parties to the deed did not intend to hinder, delay, or defraud the other creditors, when the bonds were executed and delivered to the bank as security for an antecedent indebtedness. The true character of this transaction was not disclosed to the creditors by the conveyance which was recorded. One who read the deed of trust would naturally assume that the main purpose of the company was the acquisition of new money, in order, not only to retire its outstanding indebtedness, but also to extend its business. No one would suppose that the company was in failing circumstances, or that the actual purpose was to transfer all of the bonds to the bank as security for the existing debt and for a new loan of only $26,000. The obscurity was the more complete by reason of the appointment of the bank as trustee in the deed of trust. It was not unlawful for the bank to acquire a beneficial interest in the bonds; but no one would infer from the deed that it was the intention of the parties that the trustee named in the instrument should acquire for itself a lien upon the entire issue. It may well be that not only the interests of the bank were promoted, but the other creditors were lulled into a sense of security by the form which the transfer took. If the purposes of the parties had been fully revealed, other creditors could have more readily ascertained the financial condition of the company, and might have been led to test its solvency in some proceeding in a state or federal court before the period should have elapsed during which a preference might be set aside."

We nevertheless made no finding on the point involved because it had not been raised in the trial court, and the defendants had not been brought into court to answer it. We therefore remanded this branch of the case to the District Court for further proceedings.

The original bill of complaint was also brought to secure an adjudication that certain machines of the company, which had been sold at a sheriff's sale for taxes in the year 1925, and purchased for the bank by one G. D. Miller, were purchased under such circumstances that the bank should be required to account for them to the company. We sustained this charge, and decided that the bank held the machines upon a constructive trust for the benefit of the company, and directed that they be sold to pay its debts.

When the case was returned to the District Court, Finefrock filed an amended bill of complaint, wherein he rehearsed the facts which are set out in the prior opinion in this court, alleged that the deed was made and the bonds were pledged to hinder, delay, and defraud creditors, and asked that the bank be restrained from claiming any benefit under the deed of trust, and that all the bonds issued thereunder be canceled. The amended bill also charged that the machinery purchased at the sheriff's sale had been sold by the bank since the institution of the suit, and prayed that the bank be required to disclose to whom the machinery was sold, that a receiver might be appointed to take charge of and to sell the same, or, in the alternative, that the bank might be required to account for and pay over the value of the machinery as of the date of the tax sale.

On the main question at issue in the case, the amended bill repeats the allegations as to the meeting of stockholders on June 27, 1922, at which the directors were authorized to issue the bonds and to execute the deed of trust; and also as to the meeting of directors on July 6, 1922, which authorized the officers of the company to issue the bonds and to negotiate for the sale or pledge of them when issued. The amended bill alleges that the directors of the company at that time were C. K. Myers, D. C. Schonthall, W. H. Taylor, T. F. Bailey, and the defendant, G. D. Miller, and that, at the meeting of July 6, Miller, Schonthall and Taylor were the only directors present; that the declared purpose of those who took part in the meeting was that the bonds should be sold or pledged, and the proceeds applied to the payment, of indebtedness, and the further development of the company's business; and particularly it was contemplated that Myers, the president of the company, should proceed to make sale of the bonds to certain persons whom he then had in mind.

It was further alleged that the pledge of the bonds to the bank on July 27, 1922, to secure the antecedent as well as the new indebtedness, was made with intent to hinder, delay, and defraud the creditors of the company. It was charged that at that time, and at all times thereafter, the company was heavily indebted, and was in fact insolvent; and that the directors who took part in the meeting of July 6 and in the delivery of the bonds to the bank engaged in the transaction for their own personal benefit and advantage. Thus it is said that Taylor, Myers, and Bailey on July 27, 1922, were indorsers upon a large part of the indebtedness due by the company to the bank, and desired that it should be paid off, since there was no reasonable hope that the company would be able to continue in business for any considerable time. Taylor, it is said, had the additional purpose of obtaining money for his own benefit from the proceeds of the new loan in payment of salary which was in fact not due him. In addition, it was pointed out that Miller, one of the directors, was also a director and officer of the bank, and interested in the payment of the debt due it to the exclusion of other creditors. In short, the substance of the charge was that the pledge of the bonds with the bank was done illegally and fraudulently against the interests of the company and its creditors, and for the benefit and advantage of the directors named and of the bank. This purpose and intent was fraudulently concealed from the creditors by the fact that the declared purposes in the recorded deed furnished no information that the bonds were to be pledged to the bank.

The answer of the defendant bank specifically and categorically denied that there was any fraudulent act or intent or impropriety in connection with the transactions under consideration. It was asserted that, at the time the bonds were pledged, the company was not insolvent; that the additional loan of $29,500 was made on the strength of certain statements and audits of the company's financial condition, which showed that the assets of the company were far in excess of its total liabilities; and that at that time the company expected to continue its operations, and did continue during the years 1922 and 1923 to do business on a large scale. It was also denied that the directors had any ulterior motives of self-advantage in transferring the bonds pledged to the bank or that they had any intent to hinder, delay, or defraud the creditors.

The issues raised by the bill and answer were referred to a special master, by order of the District Court, to take evidence and report his findings of fact and conclusions of law. The master reported in due course that the execution and delivery of the deed of trust and of the bonds was not done with intent to hinder, delay, or defraud the creditors. He found that, at the time under consideration, the company "was a going concern, doing in the year 1922 upwards of $350,000 worth of business, and in the following year, 1923, upwards of $300,000 worth of business; that it was solvent in the sense that its assets were equal to or greater than its liabilities, but that it was insolvent in the sense that it had not the ready cash with which to meet its obligations as they matured." The master also found that the pledge of the bonds by the company to the bank on July 27, 1922, was not done with intent to hinder, delay, or defraud the creditors. He said:

"This company, being hard up for cash with which to conduct its business, authorized the execution and delivery of the deed of trust to secure said bonds, and being so prepared, they proceeded to look for a market for said bonds; they had several prospects and were of opinion that a sale of the bonds would be consummated within a very short time. Needing money badly, it applied to the First National Bank for a temporary loan of $29,500 to be repaid to the said bank when the bonds were sold, which they considered

would be only a very short while. It appears that at this time the Bank already held the Kenova Mine Car Company's indorsed note for $70,500, as well as another note of $3,500, secured by accounts receivable assigned to it by said Mine Car Company. The application for the additional loan was handled by the Discount Committee of the First National Bank and the loan was granted, at the same time the Bank taking the entire issue of $150,000 worth of the bonds as collateral security for the $29,500 loan on that day, as well as the $70,500 which it had loaned to the Mine Car Company before that time. The Mine Car Company was unable to make sale of said bonds, and the notes maturing which they secured, and not being able to pay the same, said bonds were sold pursuant to said collateral agreement and bought in by the First National Bank. The Mine Car Company continued to do business for upwards of eighteen months, its business running into the hundreds of thousands of dollars. * * *

"I have read and re-read carefully all the evidence in this matter and I am unable to find one word or one act that would indicate that the pledge of these bonds was done with the intent to hinder, delay or defraud the Mine Car Company's creditors. If we even entertain the fancied suspicion that such was the intent, it occurs to me that the same is completely rebutted by the fact that the Mine Car Company continued in business for upwards of eighteen months thereafter, paying off many of its creditors."

Exceptions to the report of the master were filed, but the District Court, after argument of counsel and consideration of the case, approved and confirmed the report of the master in all respects, and decreed that neither the issuance nor the pledge of the bonds was made with intent to hinder, delay, or defraud creditors.

We have examined the new evidence taken in the case, and we find no such demonstration of a plain mistake as to justify a departure from the customary practice in equity which regards the findings of fact of a special master, concurred in by the District Court, as presumptively correct. The appellant depends upon the inferences of unfair dealing which, as we pointed out emphatically and in detail in the earlier opinion of this court, may reasonably be drawn from the unusual transactions between the bank and its debtor, if unexplained. Special reliance is also placed upon the personal advantage to be gained by several of the directors in securing the payment of a creditor's claim upon which they were indorsers, and upon evidence tending to show that the company was in bad financial condition at the time.

The appellant argues that the transfer of bonds was fraudulent by reason of the provisions of section 52 of chapter 53 of the Code of West Virginia, which provides that no member of the board of directors of a corporation shall vote on a question in which he is interested other than as a stockholder, or be present at the meeting while the same is being considered. We need not stop to consider whether under the evidence the directors of the company were actuated by motives of self-interest in the pledge of the bonds, as in any event the presumption of fraud, which arises for failure to observe the state statute, may be rebutted by clear and convincing evidence that the transaction was fair and reasonable, and wholly free from all taint of fraud or unfairness. Hope v. Valley City Salt Co., 25 W. Va. 789. Moreover, it should be borne in mind that it is well settled that proof of actual fraud is required when the charge is made that property has been transferred with intent to hinder, delay, and defraud creditors, and that the mere intent to prefer one of the creditors is not sufficient to establish fraud or to justify the setting aside of a preferential transfer, as sometimes happens under certain provisions of the National Bankruptcy Act (11 USCA). Coder v. Arts, 213 U. S. 223, 29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008; Herold v. Barlow, 47 W. Va. 750, 36 S. E. 8.

There is evidence to support the findings of fact of the trial court and the conclusions of law based thereon. It does not appear to have been proved that the stockholders or directors contemplated the pledge of the bonds to the bank when the execution of the deed of trust was authorized. Indeed, it is alleged in the bill of complaint, and a number of witnesses gave evidence that it was the expectation of the officers and directors of the company, that a speedy sale of the bonds would be made, and information to this effect was given to the bank. There is also evidence tending to show that, although the company was pressed for ready cash, with which to conduct its business, it was a going concern when the bonds were issued, and solvent in the sense that its assets were equal to, or greater than, its liabilities, and that it continued to do a substantial business for a considerable period thereafter. It is true that, after the hearing of the first ap-

peal in this case, it was sent back for further proceedings, because in our opinion the facts then before us loudly called for an explanation; but in the new trial, as it now appears, the trial court in effect placed upon the defendants the burden of showing by clear and convincing evidence that the transaction was not tainted with fraud, and reached the conclusion, after a careful examination, that the pledge of bonds was fair and lawful. We see no occasion to set this conclusion aside.

The special master found that the value of the machinery purchased at the tax sale by the bank was $6,000, and that the bank was entitled to a credit of $3,105.75 for the amount expended by it and interest thereon. The trial court held that the bank should pay to the complainant the balance of $2,894.75, and inserted in its decree the following statement: "And thereupon, the said defendant, the First Huntington National Bank, in open court tendered to the complainant the said sum of $2,894.75 in full satisfaction and discharge of the judgment aforesaid, which tender the complainant, by his attorney, accepted." One of the assignments of error in this appeal is that the court erred in confirming this finding of the master, the appellant contending that the valuation placed upon the machinery was too low, and that the bank, having been allowed interest upon its outlay, should have been charged interest during the period in which the company was deprived of its property.

We do not find it necessary to enter into a discussion of these questions in view of the acceptance by the appellant of the amount allowed him in full satisfaction and discharge of the judgment. He contends that there is no inconsistency in his acceptance of the money and the prosecution of the appeal, relying on such decisions as Embry v. Palmer, 107 U. S. 3, 8, 2 S. Ct. 25, 27 L. Ed. 346; McFarland v. Hurley (C. C. A.) 286 F. 365; Carson Lumber Co. v. St. Louis, etc., Railroad Co. (C. C. A.) 209 F. 191, 193; Snow v. Hazlewood (C. C. A.) 179 F. 182. But it is obvious that he falls within the general rule and not within the exceptions thereto as set out in Carson Lumber Co. v. St. Louis, etc., Railroad Co., supra, as follows:

"It is undoubtedly the general rule that a party who obtains the benefit of an order or judgment, and accepts the benefit or receives the advantage, shall be afterwards precluded from asking that the order or judgment be reviewed. Nevertheless, this rule is not absolute where the judgment or decree is not so indivisible that it must be sustained or reversed as a whole. It has no application to cases where the appellant is shown to be so absolutely entitled to the sum collected upon the judgment that the reversal of it will not affect his right to the amount accepted (Reynes v. Dumont, 130 U. S. 354–394, 9 S. Ct. 486, 32 L. Ed. 934), especially where there is not present conduct which is inconsistent with the claim of a right to reverse the judgment or decree, which it is sought to bring into review (Embry v. Palmer, 107 U. S. 3–8, 2 S. Ct. 25, 27 L. Ed. 346; Merrian [Merriam] v. Haas, 3 Wall. 687, 18 L. Ed. 29; United States v. Dashiel, 3 Wall. 688, 18 L. Ed. 268).

While the claim of the appellant, based on the deed of trust, was entirely separate and divisible from that based upon the machinery item, so that the acceptance of payment for one claim would not prevent an appeal with reference to the other, he was clearly not entitled to accept payment of either claim in full satisfaction thereof and still press his appeal upon it. This conclusion becomes the more obvious ,when another branch of this controversy, not heretofore mentioned, is considered. When the case was on its second trial in the District Court, the bank showed that on May 9, 1925, prior to the institution of the instant case by Finefrock, a lien creditors' suit was instituted in the circuit court of Wayne county, W. Va., against the Kenova Mine Car Company, by one of the creditors. On December 11, 1926, while the case at bar was pending on its first appeal, the circuit court of Wayne county filed a decree in which it was adjudicated, among other things, that the machinery purchased at the tax sale was the property of the First Huntington National Bank. Consequently the bank urged before the master and the District Judge that its right to this property had been established against all the world by the court which first obtained jurisdiction of the controversy, notwithstanding the subsequent decision of this court on the first appeal to the contrary. This contention was overruled by the special master and the District Court, but it was within the power of the bank to bring up this point for review in this appeal. It chose, however, to pay the amount adjudged to be due upon its acceptance by the appellant in full discharge of the obligation. Clearly there is no merit in the appellant's position.

The decree of the District Court will be affirmed, with costs.

Affirmed.