## LINCOLN THEATRES CORPORATION v. FLEMING et al.

### LINCOLN v. SAME.

### FLEMING et al. v. LINCOLN.
Nos. 3481, 3482, 3486.

Circuit Court of Appeals, Fourth Circuit.
July 13, 1933.

Nos. 3481, 3482:

J. P. Buchanan, of Marion, Va., for appellants.

S. Bruce Jones, Donald T. Stant, and William H. Woodward, all of Bristol, Va., for appellees.

No. 3486:

William H. Woodward, of Bristol, Va. (S. Bruce Jones, Donald T. Stant, and Bradley Roberts, all of Bristol, Va., on the brief), for appellants.

J. P. Buchanan, of Marion, Va., for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

These companion cases grow out of the bankruptcy proceedings of Boggs-Rice Company, Incorporated, and relate to certain claims filed against the estate of the bankrupt. Case No. 3481 involves a claim of Lincoln Theatres Corporation for $25,000, secured by deed of trust of May 3, 1932, upon the trucks and automobiles, furniture and fixtures, and the greater part of the accounts and notes receivable of the bankrupt; case No. 3482 involves (1) a claim of J. D. Lincoln for $2,000, also secured by said deed of trust, and (2) a claim of J. D. Lincoln to the greater part of the accounts and notes receivable of the bankrupt outstanding on March 30, 1932, under an assignment of that date, as security for his indorsement of notes of the bankrupt

in the aggregate sum of $14,466.38; and case No. 3486 involves an unsecured claim of J. D. Lincoln as assignee of the Virginia Lincoln Furniture Corporation for $8,820.13. The evidence discloses the attempts of certain persons, who owned a controlling interest in the corporation, to improve their condition on the eve of its bankruptcy, and the following preliminary statement will make more clear the nature of the transactions involved in the particular cases to be hereinafter discussed. By stipulation, the records in all of the cases may be considered and used in each appeal.

The bankrupt, a Virginia corporation, had its principal office at Bristol, Va., and for many years had operated a chain of furniture stores at Bristol, Tenn., and at Marion, Appalachia, Glade Spring, and Wytheville, Va. On February 10, 1930, the Virginia Lincoln Furniture Corporation, a Virginia corporation, acquired 51 per cent. of the capital stock of the bankrupt, and thereafter its affairs were managed and controlled by the brothers, C. C. Lincoln, Jr., and J. D. Lincoln, and by their attorney, J. P. Buchanan. The Lincoln brothers, together with their mother, owned one-third each of the Lincoln Investment Corporation, a Virginia corporation, which owned the capital stock of the Lincoln Theatres Corporation, also incorporated in Virginia. The Lincolns also owned a controlling interest in the Virginia Lincoln Furniture Corporation. The brothers represented their mother in handling the affairs of these corporations. J. P. Buchanan was secretary and attorney of each of the four corporations, and was also attorney for the brothers, individually, and held a general power of attorney to bind them in any way. These three men dominated the business operations of all the corporations, and the Lincolns were well acquainted with the interrelated transactions now to be described either directly or through Buchanan, their attorney, who was authorized to represent them. For convenience in this discussion the corporations named will be designated as follows: The Boggs-Rice Company, Inc., as the "bankrupt"; Lincoln Investment Corporation as the "Investment Corporation"; Lincoln Theatres Corporation as the "Theatre Corporation"; Virginia Lincoln Furniture Corporation as the "Furniture Corporation."

Walter F. Boggs was the president of the bankrupt when the Lincolns acquired a controlling interest therein, and thereupon C. C. Lincoln, Jr., became chairman of the board, J. D. Lincoln, a director, and J. P. Buchanan, a director and the secretary. During the year 1931 the bankrupt made little or no net profit,

and from January 1 to May 31, 1932, when it voluntarily went into bankruptcy, it steadily lost money. Internal dissensions arose during this period. Boggs, the president, was called upon to resign, and in January, 1932, an arrangement was entered into, consummated at a later date, whereby he retired from the business, and the bankrupt obligated itself, amongst other things, to pay to him $25,000 over a period of years in monthly installments, in consideration of a release by him of a salary contract and the surrender of certain stock which he held. A claim based on this contract was filed by Boggs in the bankruptcy proceedings, and is the subject-matter of another suit decided by this court this day. When Boggs retired as president, he was succeeded by Max Rice, and thereafter Rice and J. P. Buchanan were in active charge of the business, subject to the general control of the Lincolns.

█ It will be observed that the Boggs transaction, adding $25,000 to the indebtedness of the bankrupt, did not improve its financial condition. What that condition was on and after March 30, 1932, it is important to ascertain in order to understand the significance of certain transactions carried out during this period under the guidance of the Lincolns and J. P. Buchanan, their attorney. The District Judge found that on March 30, 1932, the bankrupt was insolvent within the meaning of section 1 (15) of the Bankruptcy Act, 11 USCA § 1 (15), that is to say, that the aggregate of its property, exclusive of any property which it may have conveyed, transferred, concealed, or removed with intent to defraud, hinder, or delay its creditors, was not at a fair valuation sufficient in amount to pay its debts. This finding is challenged by the claimants chiefly because financial statements, taken from the books of the corporation, indicate solvency up to the very end; but the inescapable fact is that a voluntary petition in bankruptcy was filed on May 31, 1932, only two months after the date under discussion; and, when we consider this weighty circumstance in connection with an appraisal of the assets made under the direction of the trustees, and other evidence indicating the true condition of the business, we have no hesitation in accepting the finding of fact of the trial judge as correct. Indeed, no other conclusion is possible in view of our determination that the transfers of the bankrupt's property described below were made in fraud of creditors, for, under the statute, property so transferred may not be taken into consideration in the comparative valuation of assets and liabilities. Lansing Boiler & E. Works v. Joseph T. Ryerson & Son (C. C. A.) 128 F. 701; Acme Food Co. v. Meier (C. C. A.) 153 F. 74. Furthermore, it is manifest that the true condition was known to those in charge of the Lincoln interests, for their complete control over all of the corporations, and the intimate relations between them, indicate quite clearly that they had accurate information of the real situation.

C. C. Lincoln, Jr., and J. D. Lincoln became indorsers for the bankrupt, and the series of transfers of the bankrupt's property, which we shall now consider, were inspired by this fact:

(1) On March 30, 1932, the bankrupt corporation executed an assignment wherein the indorsement of the Lincolns in the sum of approximately $60,000 on the notes of the bankrupt, held in divers banks in Tennessee and Virginia, was recited, and the bankrupt, acting through Max Rice and J. P. Buchanan, as officers of the corporation, assigned and transferred to a trustee all accounts and notes receivable belonging to the corporation payable more than 30 days thereafter, and all installment accounts due 60 days thereafter, with power in the trustee to collect the same and pay the proceeds thereof to the indorsers to the extent that they should be compelled to pay any amounts or suffer any damage by reason of their indorsement of the notes. This instrument purports to have been executed in consideration of a promise on the part of the Lincolns to indorse the notes of the corporation, but the fact is that the indorsement of C. C. Lincoln, Jr., on divers notes had been previously given, and that J. D. Lincoln regarded himself as bound thereby, and the assignment was executed for the purpose of protecting the indorser after the insolvency of the debtor had become manifest.

(2) On April 30, 1932, a month before the petition in bankruptcy was filed, the bankrupt, through Buchanan and Rice, as its officers, executed an instrument purporting to be a demand note and an assignment whereby it promised to pay the sum of $2,000 to J. D. Lincoln on demand, and assigned to him as security for the payment, accounts receivable due the corporation in the sum of $135,000, and all conditional sales contracts and securities held by the corporation in connection therewith. This assignment, however, is not relied upon in support of the claim of J. D. Lincoln, for, as stated by his attorney at the trial below, it was extinguished by the following transaction:

(3) On May 3, 1932, 28 days before the petition in bankruptcy was filed, the bankrupt, through its officers, Buchanan and Rice, executed a deed of trust whereby it conveyed to a trustee the automobiles and trucks and all personal property of the bankrupt (except the stock in trade for sale at retail located in the bankrupt's stores in Tennessee and Virginia), consisting of furniture, fixtures, and all accounts and notes receivable maturing more than 30 days after date, and all the bankrupt's rights under conditional sales contracts; in trust, to secure the payment by the bankrupt of three demand notes of May 3, 1932, one for $25,320.13, payable to bearer; one for $2,000, payable to the order of J. D. Lincoln, and one for $25,000, payable to bearer. The indebtedness represented by these notes will be more particularly described in the subsequent discussion of the particular cases.

(4) On May 11, 1932, the bankrupt, by deed of trust, executed on its behalf by Buchanan and Rice, as officers of the company, and recorded in Sullivan county, Tenn., on May 18, 1932, and in the city of Bristol, Va., on May 31, 1932, conveyed to a trustee the same property described by the previous deed of May 3, 1932, in order to cover all the equity of the corporation in the property described. The property was conveyed in trust to secure the payment of a note of the corporation for $7500 of May 12, 1932, payable to bearer on demand. This note and another note of the bankrupt of May 12, 1932, in the sum of $20,000, payable on demand, were delivered by it to the Virginia Lincoln Furniture Corporation in exchange for a like amount of preferred stock of the bankrupt, thereby converting a stockholder of an insolvent corporation into a creditor. A claim based on these notes was filed against the bankrupt estate by the Furniture Corporation, but it was denied by the District Judge, and no appeal from his decision was taken. A like transaction is considered below in case No. 3486.

(5) A meeting of the board of directors of the bankrupt was held in Marion, Va., on May 11, 1932. Rice and Buchanan, as president and secretary of the company, were empowered to manage and control the affairs of the corporation; and, in their discretion, to retire and exchange stock and to issue in lieu thereof obligations of the corporation; to make all contracts and instruments; and to do such other acts as might be necessary or advisable in the interests of the corporation, including negotiations of loans, the execution of notes, mortgages, and deeds of trust conveying the property to the corporation to secure its indebtedness. The acts of the officers of the corporation in and about its business during the preceding year were ratified and approved.

Shortly after these transactions, to wit, on May 31, 1931, as we have seen, the Boggs-Rice Company, Incorporated, filed a voluntary petition in bankruptcy upon which, on June 2, 1932, it was adjudicated a bankrupt.

### Case No. 3481.

In this case the Lincoln Theatres Corporation presents a claim based upon one of the three notes secured by the deed of trust of May 3, 1932. This note came into the hands of the Theatres Corporation in the following manner: During the early part of 1932, the banks began to press the bankrupt for payment of its outstanding notes. One of these notes for $25,000, on which C. C. Lincoln, Jr., was indorser, fell due on May 9, 1932, at the Marion National Bank of Marion, Va. J. P. Buchanan was employed as an attorney by this bank from time to time. In April, 1932, the bank gave notice to him as a representative of the bankrupt that the note must be paid upon maturity. Six days before the maturity, the deed of trust was executed, and the company's note of $25,000 payable to bearer, referred to therein, was executed on the bankrupt's behalf by Buchanan and Rice and delivered to Buchanan. He delivered the note to the Theatres Corporation, and, in consideration thereof, the latter undertook to pay the note of the bankrupt for $25,000 held by the Marion Bank. On May 9, 1932, J. P. Buchanan delivered to the bank a check for $25,000, payable to the bankrupt corporation, signed "Lincoln Theatres Corporation, Special Account," indorsed by the bankrupt in his handwriting. The Theatres Corporation did not have a special account, and did not have on hand in its regular account sufficient funds to meet the check. Nor did the bank surrender the bankrupt's note, maturing May 9, but held it until the check of the Theatres Corporation was made good on June 2, 1932, two days after the petition in bankruptcy was filed. There was evidence tending to show that the bank considered the note paid on May 9, when the check was received, and that the delay in surrendering the note was due to the fact that the bank intended to lend to the Lincoln Theatres Corporation the sum of $25,000 upon its note indorsed by the Lincolns in order to enable it to meet its check of May 9; but C. C. Lincoln, Jr., was absent from the city, and his indorsement could not be se-

cured before June 2. The fact is, however, that the matter could have been transacted at an earlier date because C. C. Lincoln, Jr., was present at the meeting of the directors of the bankrupt in Marion on May 11. Nevertheless the note given by the Theatres Corporation to the bank was not indorsed and delivered to the bank by C. C. Lincoln, Jr., and J. D. Lincoln until the afternoon of June 1, after bankruptcy, and the entries on the books of the bank, showing the payment of the note of the bankrupt corporation and the new loan to the Theatres Corporation were not made until June 2.

■ The claimant contends that the deed of trust of May 3, 1932, was valid, and that therefore its claim is secured by the accounts receivable and other property described in the deed, because the deed and the note were based upon a full present consideration and were not given in order to secure a pre-existing debt. Hence it is said there was no voidable preference under section 60a or 60b of the National Bankruptcy Act, 11 USCA § 96 (a, b), and no fraudulent transfer under section 67e or 70e of the Bankruptcy Act, 11 USCA §§ 107 (e), 110 (e). The referee ruled to the contrary, holding that the claim should be allowed only as an unsecured claim, and concluding, upon the evidence before him, that the deed was made with intent to hinder, delay, and defraud the other creditors of the bankrupt. The District Judge affirmed this ruling, saying that the evidence showed that the instrument was not made in good faith with a view to benefit the company and its creditors generally, but solely with a view to benefit the Lincolns, and that therefore the deed was obnoxious to section 67e of the National Bankruptcy Act. He therefore affirmed the order of the referee by which the claim of the Theatres Corporation was denied as a preferred, and allowed as a common claim, and directed that the dividends on the claim, filed in the name of the Theatres Corporation, be paid to the Marion National Bank as a credit on the note of the Lincoln Theatres Corporation for $25,000, indorsed by J. D. Lincoln and C. C. Lincoln, Jr.

■ We are in accord with this conclusion, not only because of the great weight to be given to the findings of fact of the referee, approved by the District Judge, but also from our own examination of the evidence. The significant facts are that C. C. Lincoln, Jr., a part owner and a director of the bankrupt corporation, was an indorser on its note for $25,000 due May 9, and it was certain that the corporation would not be able to pay the indebtedness because of its insolvent condition. He also held a one-third interest in the Theatres Corporation, which was owned entirely by members of his immediate family. Through his lawyer, he arranged to substitute the Theatres Corporation for the bankrupt as the debtor to the Marion National Bank, and to secure the Theatres Corporation by a lien on all the available assets of the bankrupt, except its shifting stock of goods; and the practical effect of this circuitous action was to release him from his indorsement without increasing his liability or diminishing the corporation's indebtedness. Taking advantage of his peculiar position, he secured a personal benefit in his capacity of indorser, and failed in his duty as an officer and director to preserve the assets of the bankrupt corporation for distribution among the general creditors. Speaking of the responsibilities of one in such a relation, the Supreme Court said in Richardson's Executor v. Green, 133 U. S. 30, 43, 10 S. Ct. 280, 284, 33 L. Ed. 516: "Undoubtedly his relation as a director and officer, or as a stockholder of the company, does not preclude him from entering into contracts with it, making loans to it, and taking its bonds as collateral security; but courts of equity regard such personal transactions of a party in either of these positions not, perhaps, with distrust, but with a large measure of watchful care, and unless satisfied by the proof that the transaction was entered into in good faith, with a view to the benefit of the company as well as of its creditors, and not solely with a view to his own benefit, they refuse to lend their aid to its enforcement." See, also, Koehler v. Black River Falls Iron Co., 2 Black (67 U. S.) 715, 17 L. Ed. 339; Am. Exchange Nat. Bank v. Ward (C. C. A.) 111 F. 782, 55 L. R. A. 356; Stuart v. Larson (C. C. A.) 298 F. 223.

In similar cases, it has been frequently held that a person who advances money to an insolvent debtor, knowing him to be insolvent, and takes the transfer of his assets as security for the debt knowing that the proceeds of the loan will be used to make a preferential payment, to the detriment of the general creditors, has engaged in a transaction from which fraud may be predicated, and therefore gets no security for his debt from the transfer and becomes merely an unsecured creditor. Such a transfer, it is usually held, indicates an intent to hinder, delay, and defraud creditors, so that, if made within four months prior to the filing of the petition in bankruptcy, the transfer is void as against creditors of the debtor, under section 67e of the National Bankruptcy Act, and the property conveyed

becomes a part of the assets of the estate, passing to the trustee. Roberts v. Johnson (C. C. A.) 151 F. 567; American Wood Working Mach. Co. v. Norment (C. C. A.) 157 F. 801; Lumpkin v. Foley (C. C. A.) 204 F. 372; Parker v. Sherman (C. C. A.) 212 F. 917; McAtee v. Shade (C. C. A.) 185 F. 442; Hertzmark v. Lynch (C. C. A.) 54 F.(2d) 38; Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419.

The appellant insists that, in determining the validity of a transfer of property in a particular locality, the federal courts are bound by the state decisions, and that under the law of Virginia, as announced in Planters' Bank of Farmville v. Whittle, 78 Va. 737, and Surratt v. Eskridge, 131 Va. 325, 108 S. E. 677, a creditor or indorser in that state may lawfully accept security from an insolvent debtor for an antecedent debt, even though he has knowledge that, by reason of the debtor's insolvency, the general creditors will be deprived of a part of their claims whilst he will be paid in full. Bearing in mind the controlling provisions of the National Bankruptcy Act, it is true that the federal courts are bound to accept the interpretation given by state courts to state statutes regulating property transfers. Holt v. Crucible Steel Co., 224 U. S. 262, 32 S. Ct. 414, 56 L. Ed. 756; Morris Plan Bank v. Cook (C. C. A.) 55 F. (2d) 176; In re Sachs (C. C. A.) 30 F.(2d) 510; Haas v. Rendleman (C. C. A.) 62 F. (2d) 701. But section 67e of the National Bankruptcy Act refers to transfers which are fraudulent and are invalidated under the well-recognized principles of the common law and the statute of Elizabeth, Coder v. Arts, 213 U. S. 223, 29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008; and there is no reason to believe that the transactions under examination in these cases would be considered lawful under the Virginia statute of fraudulent conveyances, Virginia Code of 1930, § 5184. The Virginia court, in the cited cases, recognizes the well-defined distinction between an intent to prefer a particular creditor and an intent to defraud creditors generally. Yet it is clearly set forth that a preferential transfer to be upheld must be undertaken in the utmost good faith, free from taint of fraud and suspicion, and the transfer itself will be considered along with all the other circumstances in determining whether an actual intent to defraud existed. We can see no real distinction between the rule thus laid down and that announced by the Supreme Court in Coder v. Arts, supra; Van Iderstine v. National Discount Co., 227 U. S. 575, 33 S. Ct. 343, 57 L. Ed. 652; Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419; Finefrock v. Kenova Mine Car Co. (C. C. A.) 37 F.(2d) 310. When we examine the efforts of the closely connected actors in the pending cases, obviously co-operating in pursuance of a common plan undertaken when the formal admission of bankruptcy could not long be delayed, and find that obligations were shifted from one person to another so that security for the obligors, that did not previously exist, was obtained at the expense of the creditors, and that stockholders who had lost their investments were transformed into creditors, competing for the assets of the insolvent, we discover a course of conduct involving something more than a mere intent to prefer which no court of justice would hesitate to condemn.

### Case No. 3482.

J. D. Lincoln has presented in this case two claims against the bankrupt estate, based upon the note of the bankrupt for $2,000 of April 30, 1932, secured by the deed of trust of May 3, 1932, and (2) a claim to the accounts receivable of the bankrupt based upon the assignment of March 30, 1932, executed as security for his indorsement upon certain notes of the bankrupt. The note of April 30, 1932, is contained in an instrument whereby the bankrupt agreed to pay to the order of J. D. Lincoln the sum of $2,000 on demand, and assigned to Lincoln accounts receivable in the sum of $135,000 and the conditional sales contracts held in connection therewith. The evidence shows that Max Rice, the president of the bankrupt company, which was in need of funds by reason of the failure of its bank of deposit on April 29, requested J. D. Lincoln to lend to it the sum of $2,000. Lincoln demanded security for the loan whereupon the instrument of April 30 was prepared and delivered. Lincoln's check for $2,000 was not given until May 2. The list of the accounts receivable was not made up until several days later. In the meantime, the deed of trust of May 3, described in case No. 3481, was given, whereby, amongst other things, the loan of $2,000 was secured by the assignment of the same accounts receivable. A list of the accounts was subsequently sent to the attorney, J. P. Buchanan, who had prepared the assignment, the ledger sheets were stamped to indicate that the accounts had been assigned, and the conditional sales contracts were taken from the bankrupt's place of business to Rice's residence in Virginia. This disposition of the accounts was made at the suggestion of Buchanan. The trustee in the deed, an attorney who occupied a suite of offices with

Buchanan, had knowledge of the fact, and did not object because he had confidence in Rice. By reason of these circumstances, the trustees of the bankruptcy estate made the contention that there was no surrender of dominion over the accounts by the bankrupt corporation. But, disregarding this consideration, it appears that the assignment of accounts to J. D. Lincoln, which formed a part of the instrument of April 30, was abandoned, and by common consent the parties intended to subject them to the terms of the instrument of May 3 whereby they were conveyed to a trustee. This view of the situation was taken by Lincoln's attorney in the trial below, for he stated that he was not relying upon the assignment of April 30 because it was extinguished by the later document.

The District Judge held, as we have seen, that the deed of May 3 was made with intent to hinder, delay, and defraud the creditors, and that the loan of $2,000, although made on condition that the lender be secured, was itself undertaken to defeat the operation of the Bankruptcy Act, in that it was made to keep the stores open long enough to allow the deed of May 3 to be made and the transaction with the Furniture Corporation to be consummated. Hence he reversed the order of the referee allowing the claim as a secured debt, and allowed it merely as an unsecured debt. With the conclusion of the District Judge we are in accord; for it is clear that the loan of $2,000 was of a piece with a number of transactions, all undertaken for the purpose of protecting the Lincolns at the expense of the general creditors. The assignment of accounts falls with the deed of May 3, and it may not be sustained as security for the loan of $2,000 on the theory that it was an independent transaction when the evidence shows that it was merely one part of a general plan.

The second claim of J. D. Lincoln is based upon the assignment of March 30, 1932, which has already been described. It covered all the accounts receivable and notes receivable, payable more than 30 days thereafter. Lincoln claimed these accounts as security for his liability as an indorser upon certain notes of the bankrupt, of which two, for the amounts of $8,432.38 and $6,034 remained unpaid. Testimony was given on behalf of the claimant that on March 30, 1932, he was not an indorser upon any of the notes of the company; that his brother, C. C. Lincoln, Jr., was indorser on certain notes which were about to mature, but was absent in Florida, and was not available to indorse the renewals. Under these circumstances, Rice, the president of the company, called upon J. D. Lincoln for assistance, and he refused to indorse the paper unless he was given security. Based upon this testimony, the argument is made that the security was not given for pre-existing indebtedness, but in order to assist the company in an emergency, and that therefore there was no element of a preference in the transaction and no indication of any intent to defraud the creditors.

The referee sustained the claims based on the notes for $8,432.39 and $6,034, respectively, as unsecured claims, and this decision was approved by the District Judge with the proviso that the dividends on these claims should be paid to the representative of the bank holding the notes, as a credit thereon. The District Judge found that both notes had previously been indorsed by C. C. Lincoln, Jr., and, since the Lincoln brothers regarded each as bound by an indorsement made by the other, the assignment or deed of trust of March 30 must be treated as having been given for a past consideration. The evidence abundantly supports this finding. The interests of the brothers were so closely intertwined that each was directly affected by anything that benefited or injured the other in a financial way, and each one acted in the absence of the other to protect his interest, knowing that the gain or loss involved would be shared between them. Hence the assignment or deed of trust of March 30 is subject to the same infirmity as the deed of May 3. Both transactions were undertaken when the company was insolvent to the knowledge of the participants in order to save the Lincolns from their indorsement of the company's paper by the transfer for their benefit of the greater part of the company's assets which should have been kept for a pro rata distribution amongst the general creditors. There is no material distinction between this claim of J. D. Lincoln and that considered in case No. 3481.

## No. 3486.

This case also involves a claim of J. D. Lincoln which was filed simultaneously with the two claims discussed in case No. 3482. The sum total of the claim is $25,320.13, and is made up of two amounts as follows: (1) $16,500 advanced to the bankrupt in divers amounts between February 11 and April 18, 1932, by the Virginia Lincoln Furniture Corporation at the request of J. D. Lincoln and charged to his account, and (2) $8820.13, representing furniture sold by the Furniture Corporation to the bankrupt between August, 1931, and April 26, 1932, the account having

been assigned by the Furniture Corporation to J. D. Lincoln on May 3, 1932. The total of $25,320.13 was covered by a demand note of the corporation, payable to J. D. Lincoln, and was one of the three notes secured by the deed of trust of May 3, 1932. The total claim was allowed as an unsecured claim by the referee, and this finding was approved by the District Judge. The trustees in bankruptcy do not dispute that part of the claim represented by cash advanced in the sum of $16,-500, but contend that the remaining $8,820.13 does not represent a valid indebtedness due by the bankrupt estate either to the Furniture Corporation or to J. D. Lincoln. The claimant, on the other hand, does not dispute the correctness of the decision below that the claim should be allowed only as an unsecured claim, since security was given for a pre-existing debt. Hence the only question is whether the sum of $8,820.13 should be allowed as an unsecured claim.

This claim grows out of a contract between the Furniture Corporation and the bankrupt of February 10, 1930, under which the Furniture Corporation sold to the bankrupt, prior to August, 1931, furniture to the amount of $27,500, and between that date and May 3, 1932, furniture in the amount of $8,820.13. The agreement provided that the Furniture Corporation would sell and deliver merchandise manufactured by it to the bankrupt at the regular price, and accept, in payment therefor, 7 per cent. preferred stock of the bankrupt at par. The contract was carried out to the extent of preferred stock in the amount of $27,500, which was issued for merchandise from time to time after April 30, 1930, and was outstanding on December 31, 1931. This stock was held by the Furniture Corporation until May 12, 1932, when, the insolvent condition of the bankrupt being known to all of the participants, the bankrupt and the Furniture Corporation entered into an agreement whereby the bankrupt issued to the Furniture Corporation two notes of $20,000 and $7,500, and, in consideration thereof, the Furniture Corporation surrendered to the bankrupt the $27,500 of its preferred stock. After the bankruptcy, the Furniture Corporation filed a claim against the estate for $27,500, but this claim was disallowed both by the referee and the District Judge on the ground that the effect of the transaction was to transform a favored stockholder into a creditor at the expense of the genuine creditors. No appeal was taken from this decision; and the transaction is significant at this time only for the light which it throws upon the claim now under discussion, and on the common purpose for which, in our opinion, all of the transactions disclosed in these cases were undertaken.

The claimant seeks to distinguish the furniture account of $8,820.13 from that of $27,500, on the ground that, in the latter, the contract was actually carried out by the issuance of a corresponding amount of preferred stock. It is pointed out that the contract of February 10, 1930, was indefinite both as to the amount of furniture to be supplied and the period during which the arrangement should continue; and that such an agreement is so vague as to be lacking in legal validity. While this objection would be fatal in the case of an executory contract, it is not tenable in regard to the merchandise supplied in definite amounts at fixed prices in accordance with the understanding between the parties. So far as the evidence shows, the Furniture Corporation had given no notice of a change of purpose or an abandonment of the understanding, and hence it must be assumed that the goods were shipped on the same basis as prior deliveries. The result was that the Furniture Corporation was entitled to demand and receive certificates of preferred stock of the bankrupt in an amount equal to the face of the bill. In legal effect, the Furniture Corporation was a subscriber to stock who had paid the full amount of his subscription and was entitled to all the rights of a stockholder, lacking only the evidence of ownership of a stock certificate. Pacific Nat. Bank v. Eaton, 141 U. S. 227, 11 S. Ct. 984, 35 L. Ed. 702; Swobe v. Brictson Mfg. Co. (C. C. A.) 279 F. 560; Jellenik v. Huron Copper Mining Co., 177 U. S. 1, 12, 13, 20 S. Ct. 559, 44 L. Ed. 647.

We are unable to dissociate this furniture transaction in principle from the dealings which preceded it. Merchandise was sold and delivered in exchange for preferred stock of the buyer at par, and the present claim is merely an effort of the parties, after the bankruptcy of the buyer had become inevitable, to transform the seller from a stockholder into a creditor. No argument is needed to demonstrate that such an action is void and of no effect. A corporation, it is true, according to the general rule which prevails in Virginia, may buy back its own stock in the absence of a charter or statutory prohibition, but the rule is subject to the qualification that the power may not be exercised with intent to injure the creditors, or in such a way as to adversely affect their rights. See the authori-

ties cited in Walter J. Boggs v. J. H. Fleming et al. (C. C. A.) 66 F.(2d) 859, decided this day.

Case No. 3481 affirmed.
Case No. 3482 affirmed.
Case No. 3486 reversed.